(64 App. Div. 450.)

PEOPLE v. MILLER.

(Supreme Court, Appellate Division, Second Department. October 11, 1901.)

1. CRIMINAL LAW—LARCENY—INDICTMENT—EVIDENCE—VARIANCE.

Under Code Cr. Proc. § 275, requiring the indictment to contain a clear and concise statement of the crime charged, a prosecution for common-law larceny by stealing and carrying away will not be sustained by evidence showing that the complaining witness had voluntarily parted with the money to enable accused to make speculative investments therewith at his own risk, though indirectly for her benefit, being influenced thereto by the accused's false pretenses, though Pen. Code, § 528, includes the obtaining of money by false pretenses in the crime of larceny.

2. SAME—INSTRUCTIONS.

Where, on a prosecution for common-law larceny, the court instructed that, if the money was obtained by false pretenses, the accused was not guilty, and on the jury returning for further instructions, having misunderstood the charge, stated apparently the contrary, it was error to refuse to repeat the first instruction.

Goodrich, P. J., dissenting.

Appeal from Kings county court.

William F. Miller was convicted of grand larceny, and he appeals. Reversed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, JENKS, and SEWELL, JJ.

Frederick B. House (Louis J. Vorhaus, on the brief), for appellant.

John F. Clarke, Dist. Atty., for the People.

HIRSCHBERG, J. The details of the defendant's swindling scheme are fully set forth in the dissenting opinion of the Presiding Justice. By falsely pretending to form a syndicate connected with membership in the New York Stock Exchange, and by further falsely pretending that thereby he was enabled, through inside tips, to reap great financial benefit in stock transactions, he induced many of the ignorant and unthinking to furnish him with money under the guise of purchasing shares in the alleged syndicate, and on his promise to pay them 10 per cent. weekly on the investments, and to refund the money on one week's notice. The whole scheme was fraudulent and felonious. He was not in any way connected with the stock exchange. He did not gamble in securities or otherwise, so far as the evidence shows. There were no syndicate shares to sell, and the principal sums received were used by him to pay the weekly interest, and to make good such items of principal as were demanded. The evidence warrants the inference that the intent from the inception of the scheme was to cheat and defraud the owners out of the money deposited, less such repayments as might be necessary during the period preceding detection and flight, so that, on the whole case, no doubt need be entertained that in receiving the complainant's money the defendant was guilty of the crime of grand larceny, with which he is charged, in some one of the forms of that offense as defined in the Penal Code. The indictment, however, contains two counts,—one charging a common-law larceny of the complainant's money, viz. that on a certain day the defendant did feloniously steal, take, and carry away $1,000 of money belonging to Catherine Moeser; and the other charging grand larceny, as a felonious breach of trust, to wit, that, having in his possession on that day such money, as her agent, bailee, or trustee, he feloniously appropriated it to his own use. There was no charge made to the effect that he was guilty of larceny because he had obtained possession of the money by color or aid of fraudulent or false representation or pretense, with the intent to deprive or defraud the owner of her property. The learned district attorney elected upon the trial to proceed upon the common-law count alone, and the point urged by the defendant upon this appeal is not so much that his crime does not constitute larceny in some of the forms as defined in section 528 of the Penal Code, but that, if so, it only constitutes larceny as then for the first time made such by statute, but formerly known as the crime of false pretense, and that he could, therefore, only lawfully be convicted under an indictment specifically charging him with the crime as created by the statute; in other words, the point is made that a defendant cannot be convicted of a statutory crime under a common-law indictment. The argument underlying the question.

presented is undoubtedly sound, the Code of Criminal Procedure expressly requiring a statement of the act constituting the crime to be set forth in the indictment (section 275); and the conviction of the defendant must therefore be reversed, unless his crime was larceny at common law. People v. Dumar, 106 N. Y. 502, 13 N. E. 325.

Section 528 of the Penal Code is so framed as to embrace under the general crime of larceny not only that offense as defined at common law, but also embezzlement, obtaining property by false pretenses, and felonious breach of trust. But, while each and every of these offenses is now larceny, it does not follow that proof of one will justify a conviction for the other. If the charge is common-law larceny, the proof must support it, and evidence of embezzlement or false pretense will not justify conviction. Such a conviction would be subject to the criticism which was expressed in the case of People v. Dumar, 106 N. Y. 508, 13 N. E. 327, that "as to the act ,charged there was no proof; as to the act proved, no allegations." Larceny, at common law, was accomplished by either trespass or trick. That the property or money was voluntarily delivered or paid over to the thief was no defense, provided the delivery or payment, if not effected by trespass, was the result of a device practiced with the intent to steal, and the complainant did not part or intend to part with the title to the property. The latter element was essential, for if, by any swindling trick or device, the victim could be induced to part with the title voluntarily, absolutely, and not conditionally, the crime was other than larceny. Wharton, in his work on Criminal Law ([9th Ed.] § 964), states the rule as follows:

"At common law the principle is that, where the owner retains the property of the goods in himself, and only parts with the possession, he may maintain larceny against the person who animo furandi obtains from him such possession, and then converts the goods. * * * The same rule applies to all cases of bare possession obtained by trick or fraud. * * *" Section 965: "If, however, the property in the goods is passed, not conditionally, but absolutely, then at common law * * * a prosecution for larceny must fail."

Bishop, in his work on Criminal Law (volume 1 [7th Ed.] § 582), states:

"If one, meaning to steal another's goods, fraudulently prevails on the latter to deliver them to him under the understanding that the property in them is to pass, he commits neither larceny nor any other crime by the taking, unless the transaction amounts to an indictable cheat. But if, with the like intent, he fraudulently gets leave to take the possession only, and takes and converts the whole to himself, he becomes guilty of larceny; because, while his intent is thus to appropriate the property, the consent which he fraudulently obtained covers no more than the possession."

The distinction is elementary, and has been repeatedly pointed out by the courts in this state. In Smith v. People, 53 N. Y. 111, 13 Am. Rep. 474, it is stated in the headnote as follows:

"If by a trick or artifice the owner of property is induced to part with the custody or naked possession for a special purpose to one who receives the property animo furandi, the owner still meaning to retain the right of property, the taking is larceny; but if the owner part not only with the

possession, but the right of property also, the offense of the party obtaining them will not be larceny, but that of obtaining goods under false pretenses."

In Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123, the court said (page 329, 67 N. Y., and page 129, 23 Am. Rep.):

"There is, to be sure, a narrow margin between a case of larceny and one where the property has been obtained by false pretenses. The distinction is a very nice one, but still very important. The character of the crime depends upon the intention of the parties, and that intention determines the nature of the offense. In the former case, where by fraud, conspiracy, or artifice the possession is obtained with a felonious design, and the title still remains in the owner, larceny is established. While in the latter, where title, as well as possession, is absolutely parted with, the crime is false pretenses. It will be observed that the intention of the owner to part with his property is the gist and essence of the offense of larceny, and the vital point upon which the crime hinges and is to be determined."

To the like effect are Hildebrand v. People, 56 N. Y. 394, 15 Am. Rep. 435; Zink v. People, 77 N. Y. 114, 33 Am. Rep. 589; Justices of Court of Special Sessions of New York County v. People, 90 N. Y. 12, 43 Am. Rep. 135; Thorne v. Turck, 94 N. Y. 90, 46 Am. Rep. 126; People v. Morse, 99 N. Y. 662, 2 N. E. 45; People v. Cruger, 102 N. Y. 510, 7 N. E. 555, 55 Am. Rep. 830; People v. Laurence, 137 N. Y. 517, 33 N. E. 547; People v. Dean (Sup.) 12 N. Y. Supp. 749; Weyman v. People, 4 Hun, 511, affirmed in 62 N. Y. 623; Kelly v. People, 6 Hun, 509; People v. Gottschalk, 66 Hun, 64, 20 N. Y. Supp. 777; People v. Evans, 69 Hun, 222, 23 N. Y. Supp. 717; People v. Hughes, 91 Hun, 354, 36 N. Y. Supp. 493; People v. Sumner, 33 App. Div. 338, 53 N. Y. Supp. 817.

It is not always easy to apply the principle to the facts, and to determine with precision when a complainant has or has not intended to part with the title to money or property. A good title, of course, can never be acquired by crime, but the intention to confer title will characterize the grade and quality of the crime by which the intention was created. In Smith v. People, supra,—which is probably the closest case in this state,—the prosecutor was induced to deliver $90 to one of the prisoners, to be used in a throw of dice with the latter's confederate, on the assurance that, if the prisoner lost, he would get a $500 check cashed at the bank, and thus repay the $90. The court concluded that, although the case was on the border line, it presented a fair question for the jury to decide as to the intention of the prosecutor to part with the ownership of the money. But even in that case it is apparent that the transfer of the money to the thief was not absolute, but was wholly conditional upon his losing at the throw of the dice. If he won, the identical money was to be returned to the owner. In many of the cases the delivery of the money or property was for a special purpose. In Hildebrand v. People, supra, and Justices of Court of Special Sessions of New York County v. People, supra, the money was given to be changed only, the change to be returned at once to the owner. In People v. Morse, supra, it was deposited only as security, the identical money to be returned; as was also the case in People v. Gottschalk, supra, and in People v. Evans, supra. In People v. Laurence, supra, the cars

were delivered to the defendant for the special purpose of having an electrical equipment attached, and there was no pretense of the transfer of the title. In People v. Hughes, supra, the money was delivered for the sole purpose of the purchase of merchandise by the defendant on the joint account, with no intention on the part of the complainant of contributing the money as part of the copartnership capital until the defendant had paid in his promised contribution. And in People v. Sumner, supra, it was uncontradicted that the money was delivered by the complainant to the defendant with strict instructions to hold it, and not to pay it over to any one, until authorized to do so by the owner. In all these cases, therefore, it is quite apparent that the owner of the money or other property involved was not induced by stratagem or otherwise to part, or to intend to part, with anything but the temporary custody of the money or chattels, and that, as a consequence, the conversion by the defendant amounted in each instance to the crime of larceny at common law. On the other hand, in Zink v. People, supra, the victim was induced by the false representations of the defendant to invest the latter with the indicia of ownership of property; and, although the representations were made in pursuance of a previous design on the part of the defendant to obtain the goods for his own use, and to cheat the owner out of them, the offense was held to be the obtaining of property under false pretenses, and not larceny. The case of People v. Dumar, supra, is similar in fact and principle. In Thorne v. Turck, supra, it was held that, where one called at the residence of another, and there told a wholly false story for the felonious purpose of obtaining money under the pretense that it was necessary to pay his expenses, the money having been voluntarily paid to him to use for his own purposes, there was no larceny. The court said (page 95, 94 N. Y., and page 127, 46 Am. Rep.):

"The money here was voluntarily parted with by the owner for the purpose of being expended in the payment of the expenses of the person who obtained it. It was not to be kept for the benefit of the owner, or to be returned to him, and no right was retained to the same. The most that can be said as to the owner's right to the money is that there was a promise to pay back to him the same amount."

In Kelly v. People, supra, the defendant deposited with the complainant, as security for the loan of $50, certain spurious pieces in the form and similitude of gold coin, and which he represented to be gold coin, and thereafter absconded with the $50 so obtained, and his conviction for larceny was reversed upon the ground that the transaction amounted only to false pretenses.

Applying these cases to the facts now before us, it is difficult to see how any question can be seriously entertained as to the character of the defendant's crime. Undoubtedly, influenced by his false and fraudulent representations, frequently made by means of public circulars and advertisements, although not made to her in person, Mrs. Moeser was induced to voluntarily give to him the sum of $1,000, intending to invest him with the right of using it in speculation at his own risk, although indirectly for her benefit. She paid the money to him in currency, and took back his receipt, stating that he had re-

ceived it "for an interest in the Franklin Syndicate; principal guar-
antied against loss by surplus, and can be withdrawn at any time
upon one week's notice and the return of this receipt; 10 per cent.
interest paid weekly on this deposit until principal is withdrawn."
In her testimony, Mrs. Moeser clearly states how she came to make
the deposit, and what her expectation was in reference to it. She
said:

"After reaching the place where Miller was sitting, I gave him my thou-
sand dollars. The thousand dollars was in United States currency. It
was in bills. I do not wish to mention where I got the thousand dollars
from. I asked him if he would insure the money against loss, and he said
the coupon was insurance enough. By the coupon he referred to the paper
which he gave me. * * * No person acting for the defendant asked me
to put in the thousand dollars. I conceived the idea myself that it would
be a good thing to put in a thousand dollars, and receive a hundred dollars
a week interest. * * * There was no representation made to me by the
syndicate, but I read something in the papers somewhere, I do not know
where, that Vanderbilt, Gould, and all them made money in Wall street.
I knew this was true, and I thought this money was to be used for the
same purpose, and I would get the benefit of it."

It is impossible to misunderstand this language, and no room is
left for doubt as to her intentions at the time. She intended to give
the defendant her money to gamble with in his own name if he saw
fit, only stipulating that she should receive the interest for the use
of the money, and be repaid upon demand. The money was not de-
livered for any special purpose, or to be used or invested in any
way for her. It was to be his money; that is to say, if he lost it in
Wall street or elsewhere, it was to be his loss, not hers. She did not
expect that it would lie idle and intact until she should choose to
reclaim it, or that in that event the identical bills would be returned
to her. In other words, she did not intend to invest the defendant
with the mere naked custody and possession of the money for safe-
keeping, nor did she give it to him with either instructions or ex-
pectation that he would do any specific thing with it for her, but
she gave it to him so that he might gamble with it in Wall street,
if he saw fit; but whether he did or not, and whether he won or
not, she expected interest for the use of the money, and on demand
a return, not of the same money, but of a like amount. Her con-
sent to the use by the defendant of her money was not limited to its
custody and possession, but included the right to hazard it at will.
She therefore intended to part with title to and dominion over the
money. Whether the title actually passed while the defendant still
retained possession of the bills is not the question. It is sufficient
that she intended at the time to give him title. The defendant's
crime in fraudulently inducing her to do so by the public practice
of a felonious scheme may be larceny under the terms of the Penal
Code, but, as such schemes were effective in inducing her to volun-
tarily part with the property right in the money, and not the mere
temporary possession, it was not the stealing, taking, and carrying
away of common-law larceny, as charged in the indictment. The
language of the court in Kelly v. People, 6 Hun, 511, is quite ap-
plicable:

"When the bills were delivered, it was the owner's intention that they should become the property of the prisoner, who received them. Those bills were not to be returned, but others afterwards were, for the purpose of discharging the debt created by the loan. The title passed from the owner of the bills with his consent; procured, it is true, by fraudulent representations. That did not constitute the crime of larceny, but that of obtaining money by false pretenses. The distinction between the offenses, although a narrow, is still a material, one. When the possession of property is procured by artifice or trick, with a felonious design, while the title of the owner remains unchanged, a case of larceny will be made out. But if the owner is deceived into the surrender of the title, as well as the possession, of his property, by means of fraudulent representations, then the offense will not be one of larceny, but of false pretenses."

Nor is it necessary that any words should be spoken to the complainant to create a false pretense. People v. Court of Oyer & Terminer, 83 N. Y. 436. It need not be made personally to the defrauded party (Com. v. Call, 21 Pick. 523; People v. Wakely, 62 Mich. 297, 28 N. W. 871); and it may be made by advertisement (Jackson v. People, 126 Ill. 139, 18 N. E. 286; State v. Sarony, 95 Mo. 349, 8 S. W. 407). That the present indictment is insufficient as a basis of a conviction on the facts as we find them was expressly held in People v. Dumar, supra. The court decided in that case that a conviction could not be sustained where the pleading was in the common-law form, but the proof established guilt in some one of the other forms now embraced together as larceny in the Penal Code. There the indictment was for larceny as at common law, while the proof established larceny by false pretense. Here, as there (page 511, 106 N. Y., and page 328, 13 N. E.), "the difficulty is that the act stated was not proven, and that the act proven was not stated." •

If the views herein expressed are sound, there was no legal justification for the submission to the jury of the question whether Mrs. Moeser intended to part with her money when she gave it to the defendant. If they are unsound, and the question of her intention may be assumed to be open and debatable, there must still be a reversal because of the conflicting charges upon the subject mainly discussed. Before the jury retired, the learned county judge was requested by the defendant to charge them that: "If the defendant obtained the use of the money of the complaining witness by means of false and fraudulent representations, then they must acquit the defendant;" to which the court replied: "That is so. He is not on trial for obtaining money by false representations. He is on trial for common-law larceny." After the jury had deliberated for some time, they returned for further instructions, with the following message, viz.: "Did you charge as follows: 'If the defendant obtained the one thousand dollars from Mrs. Moeser under false pretenses, he is guilty of larceny as charged in the indictment?'" To this the court responded: "I do not now know whether I used that exact language or not, but I did intend to say to you that if by means of false pretenses, which were used as a part of the device or scheme, trick or artifice, for the purpose of obtaining this money from Mrs. Moeser, while the defendant intended to appropriate the property to his own use, he appropriated it, and did not use it for

the purpose for which it was given to him, then he is guilty of grand larceny under this indictment." And, after quoting from the prevailing opinion in People v. Sumner, supra, the court added: "Wherefore it is the law that if this defendant, intending to appropriate the thousand dollars of Mrs. Moeser, by a false representation, pretense, artifice, trick, or device got possession of it for a special purpose, and applied it to his own use, or at any time thereafter conceived the intent of applying it to his own use, and did so, he is guilty of larceny under this indictment." Thereafter the defendant's counsel said: "I respectfully request your honor to say to the jury, in view of the requests of the jury, that, if the defendant obtained this money by false representations, he cannot be convicted under this indictment;" but the court refused this time so to charge, and the defendant's counsel duly excepted.

It is impossible to say that the defendant was not prejudiced by this refusal, or, indeed, to say upon what theory the verdict was finally reached. The refusal to charge that the defendant could not be convicted under this indictment of the larceny involved in obtaining money by false representations might be justified under ordinary circumstances on the ground that it had already been once distinctly charged. But where the jury manifestly misunderstood the charge, apparently taking it just the other way from that intended by the court, the defendant was certainly entitled to have it plainly repeated, notwithstanding the efforts of the court to explain to the jury the distinction between false representations as the basis of a criminal accusation and such representations as a mere incident to some other and independent felonious scheme or device. In view of the jury's message and the explanation with which it was met, including the suggestion by the court that their obvious misconstruction was not in the exact language of the contrary instruction previously given, the final refusal must be regarded as equivalent in effect to a charge that the defendant could be convicted for obtaining complainant's money by fraudulent representations under an indictment which charged only common-law larceny. It may be conceded that courts should not indulge in nice or mataphysical distinctions for the benefit of wrongdoers. The chief objection presented in this case, however, relates to a matter of substance absolutely necessary to the preservation of the rights of the innocent who may be unjustly accused. Such rights would be maintained with difficulty, if at all, were indictments to be deemed adequate although wholly failing to state the act constituting the crime. And, on the other hand, it should be constantly borne in mind that in a civilized country even the meanest criminal is entitled to be accompanied to his cell by all the essential forms of law.

The judgment of conviction should be reversed, and a new trial ordered. All concur, except GOODRICH, P. J., who dissents.

GOODRICH, P. J. (dissenting). The defendant appeals from a judgment of conviction upon an indictment for larceny in the first degree, the second count of which charged that he and one Schlessinger, on November 16, 1899, "one thousand dollars, in the money

and lawful currency of the United States, of the value of one thousand dollars, of the goods and chattels and property of one Catherine Moeser, then and there being found, feloniously did steal, take, and carry away, to the great damage of the said C. M., against the form of the statute in such case made and provided." At the close of the evidence the defendant moved:

"First, that the indictment be dismissed, and the defendant discharged, on the ground that the testimony on the part of the people fails to show that the crime of larceny has been committed, as set forth in the indictment; second, that the indictment be dismissed, and the defendant discharged, on the ground that there is a fatal variance between the proofs offered by the people and the allegations of the indictment upon which the defendant is being tried."

The defendant moved:

"That the court may advise the jury to acquit the defendant on the following grounds: First, that the evidence is insufficient to warrant a conviction; second, that there is no evidence for the jury, and that the evidence on the part of the people is not sufficient on which to base a conviction; third, that the people have failed to prove beyond a reasonable doubt that the defendant is guilty of the crime charged in the indictment."

The court denied the motions, and, after counsel had summed up, and the court had charged the jury, a verdict of guilty was returned. Thereupon the defendant moved for a new trial on the following grounds:

"First, because the verdict is contrary to the law; second, because the verdict is clearly against the evidence; third, because the verdict is against the weight of evidence; fourth, because the court erred in denying the defendant's motions to dismiss the indictment and to discharge him from custody; fifth, because the court erred in denying the defendant's motions to advise the jury to acquit; sixth, because the court at the trial admitted illegal and improper evidence against the defendant's objection, and excluded legal evidence offered by him, and the defendant at the trial excepted to such admission and exclusion; seventh, because the court at the trial misdirected the jury in matters of law, and refused to instruct them as requested by the defendant, and the defendant at the trial excepted to such misdirection and refusal; eighth, because it does not appear from the record of the verdict of what crime the defendant has been found guilty. Those are the different grounds upon which the defendant asks for a new trial. By the Court: Those motions are denied. By Mr. House: The defendant takes an exception to the denial on the several grounds specified. The defendant now moves for an arrest of judgment on the following grounds: First, because the facts stated in the indictment do not constitute a crime; second, because the indictment charges more than one crime in a single count; third, because it does not appear from the record of the verdict of what crime the defendant has been found guilty; fourth, for errors apparent upon the face of the record."

The motions were denied, and the defendant excepted, whereupon the court sentenced the defendant to be confined in the state prison at Sing Sing, at hard labor, for the term of 10 years.

The learned counsel for the defendant have furnished the court with elaborate briefs in which numerous authorities are cited to show that the defendant was not guilty of larceny at common law. I cannot discover the relevancy of these citations. The defendant was indicted under a statute which, taking the place of the common law, specifically defines the crime of larceny; and the question involved was whether or not the defendant was guilty of the crime

thus defined.  As I read the statute, it embraces in one paragraph the former crime of obtaining money by fraudulent or false representation, the crime of obtaining it by false or fraudulent pretense; and larceny at common law was intended to meet and obviate the nice distinction between these crimes discussed in the previous authorities, a distinction by reason of which many convictions were reversed on the ground that the indictment charged the one crime, while the evidence showed the defendant to have been guilty of the other.  It is to this class of authorities that many of the defendant's citations relate.  They are not relevant to the inquiry before us on this appeal.

Pen. Code, § 528, so far as it relates to the offense charged, reads as follows:

"Larceny defined.  A person who, with the intent to deprive or defraud the true owner of his property, * * * or to appropriate the same to the use of the taker, * * * either: 1. Takes from the possession of the true owner, * * * or obtains from such possession by color or aid of fraudulent or false representation or pretense, * * * or appropriates to his own use, * * * any money, * * * steals such property, and is guilty of larceny."

The section is multifarious, embracing several distinct offenses. The crime of larceny, as therein defined, was committed by the defendant if either of the following conditions appear upon the evidence:  (1) If the defendant, with intent to deprive or defraud Mrs. Moeser of her money, or to appropriate the same to his own use, took the $1,000 from her possession.  (2) If the defendant, with intent to deprive or defraud Mrs. Moeser of her money, or to appropriate the same to his own use, obtained the money from her possession by color or aid of fraudulent or false representations or pretense. (3) If the defendant, with intent to deprive or defraud Mrs. Moeser of her money, or to appropriate the same to his own use, took the money from her possession; and appropriated the same to his own use.  (4) If the defendant, with intent to deprive or defraud Mrs. Moeser of her money, appropriated the same to his own use.  In People v. Jeffery (Sup.) 14 N. Y. Supp. 837, it was held:

"In our Penal Code there is no such crime as obtaining property under false pretenses.  The offense of obtaining property under false pretenses, which was formerly a crime standing by itself, and well defined, is now included under the general term of 'larceny.'  Under chapter 4 of this Code, larceny includes not only the offense as it was defined at common law and by the Revised Statutes.(2 Rev. St. pp. 679, 690), but also embezzlement, obtaining money by false pretenses, and felonious breach of trust.  By section 528 of that Code, any person who is guilty of the acts by which he appropriates property to the use of himself or another person is guilty of larceny."

In People v. Dumar, 106 N. Y. 502, 13 N. E. 325, the court, Danforth, J., writing, said that under our former system a substantial distinction was recognized between the crimes of larceny and false pretenses.

"But the Penal Code recognized that the moral guilt of the two offenses was the same, and swept away the theory by which the courts had felt constrained to distinguish them in principle.  By it larceny is so treated (chapter 4) as to include not only that offense as defined at common law and

by the Revised Statutes (2 Rev. St. pp. 679, 690), but also embezzlement, obtaining property by false pretenses, and felonious breach of trust. We find in section 528 of that act certain acts enumerated either one of which performed by any person with intent to defraud the true owner of his property, or of its use or benefit, or to appropriate the same to the use of the taker or of any other person, makes him guilty of larceny, and he, in the language of the Code, 'steals' such property. The crime is committed when, with that intent, a person  *  *  *  obtains it from such possession [that of the true owner] by color or aid of fraudulent or false representations or pretense."

In People v. Laurence, 137 N. Y. 517, 522, 33 N. E. 549, the court said:

"Larceny is defined in section 528 of the Penal Code so as to include not only that offense as constituted at common law and under the Revised Statutes, but also embezzlement, obtaining property by false pretenses, and the felonious breach of a trust. To constitute larceny, it is not needful that the property stolen should have been taken from the owner by a trespass. But if a person obtains possession of the property from the owner for a special purpose by some device, trick, artifice, fraud, or false pretense, intending at the time to appropriate it to his own use, and he subsequently does appropriate it to his own use, and not to the special purpose for which he received it, he is guilty of larceny; and so it has repeatedly been held. Smith v. People, 53 N. Y. 111, 13 Am. Rep. 474; Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123; People v. Morse, 99 N. Y. 662, 2 N. E. 45. In such a case it is essential for the people to show not only that the person obtained possession of the property in that way, but that he did it animo furandi, with the intention at the time of subsequently appropriating it to his own use."

This brings us to a consideration of the evidence for the purpose of ascertaining whether it was sufficient to warrant a verdict finding the defendant guilty of the crime charged in the indictment. There is evidence tending to show the following facts: In March, 1899, the defendant devised and began to put into operation a scheme for securing the deposit with him of money by persons who might desire to enter into stock speculations. This scheme, in its infancy, was quite moderate in extent, but grew by what it fed upon until the defendant had received enormous deposits from all sections of this country, Canada, and one from Europe. Originally, he promised that for every $10 or more deposited with him he would pay the depositor 10 per cent. weekly until the deposit was withdrawn, the deposit being guarantied against loss by "surplus," and withdrawable at any time on one week's notice. The defendant was a member of a prominent Brooklyn church, and at one time president of the Christian Endeavor Society attached to that church. In this connection he became intimate with young men attending the Sunday school, three of whom—Hartman, Bergstrom and Bragge, from 17 to 20 years of age—he induced to invest small sums of money with him. He claimed to be able to pay them 10 per cent. per week on their investments, stating that he had secured "inside information" which would enable him to make the promised returns. Bergstrom, apparently, was the first investor, and on March 16, 1899, received from Miller a paper reading as follows:

"Mar. 16, 1899.

"Received C. Oscar Bergstrom ten dollars $00/100$ for a/c speculation in stocks. The principal guarantied against loss. Dividends weekly from $1 upwards till principal is withdrawn.                    Wm. F. Miller."

On April 8th, Bergstrom invested a further sum of $10, and received the following receipt:

"April 8, 1899.

"Received from C. Oscar Bergstrom the sum of ten ($10.00) dollars. Principal guarantied against loss, and may be withdrawn at any time. Dividends to be paid weekly in sums of one ($1.00) dollar and upwards.

"Wm. F. Miller."

At this time Miller had made his headquarters at the store of Heber & Brandt, on the corner of Marcy and Park avenues, Brooklyn. In the latter part of February he hired the top floor of No. 144 Floyd street, a two-story frame dwelling house in a residential neighborhood; and some time in October he hired the whole house. At first he occupied one room, the furniture consisting of two or three chairs, a small table, a desk, and a safe. In August he employed three boys, about 14 years of age,—John and Louis Miller and Charles Scherer,—and they also became investors. His working force gradually increased, there being at one time 22 persons engaged in writing out dividend checks alone. On April 20th, he persuaded Brandt to invest $10, on the 22d another $10, in June $100, in August $10, and on November 17th $50. Some other depositors had been secured early in the life of the scheme, and from the outset he offered as an inducement 5 per cent. commission upon the amount of any deposits secured by any person, and this continued during the entire existence of the scheme. The business grew with great rapidity. The commission of 5 per cent. and the actual payments of the weekly dividends encouraged investments. The 10 per cent. was promptly paid each week. It is apparent that this percentage was paid out of the receipts from customers, and not from speculations or investments. In the early days of what the defendant called the "Syndicate," some of the receipts were written upon stray scraps of paper, or upon slips headed with the name and business of Brandt & Heber, but in August appeared elaborately printed receipts reading as follows:

An Investment of $10.00 will Net You a Profit of $52.00 a Year.

William F. Miller, Mgr. Franklin Syndicate, Bankers and Brokers.

Stock Exchange, daily, from 10 a. m. to 3 p. m.

Stocks, Bonds, Wheat, Cotton.

Residence & Mail Address:
144 Floyd St., Brooklyn, N. Y.          New York, —————.

[Picture Ben. Franklin.]

The way to wealth is as plain as the road to market.—Franklin.

Brooklyn, New York, Aug. 24, 1899.

Received from Mr. Gus. Brandt the sum of ten dollars ($10.00) for a one share interest in the Franklin Syndicate. (Principal guarantied) against loss, and may be withdrawn at any time. Dividends to be paid weekly in sums of one dollar and upwards per share until principal is withdrawn.

William F. Miller.

The defendant never was a member of the stock exchange, and was not entitled to any privilege of the floor, and he was not an in-

dividual banker under the statute of this state. Later appeared another certificate, a finely engraved instrument, as follows:

Investors Guarantied against Loss.

William F. Miller, Mgr. Franklin Syndicate.

Investments, Stocks, Bonds, Wheat, Cotton.

Correspondence Bureau & Mail Address:

144 Floyd St., Brooklyn, N. Y.        Brooklyn

and

New York, Charlestown, Mass.

[Ben. Franklin.]

The way to wealth is as plain as the road to market.—Franklin.

$50 ⁰⁰/₁₀₀.        Brooklyn, New York, Nov. 17, 1899.

Received from August H. Brandt the sum of fifty dollars for an interest in the Franklin Syndicate. Principal guarantied against loss by surplus, and can be withdrawn at any time upon one week's notice and the return of this receipt. 10 per cent. interest paid weekly on this deposit until principal is withdrawn.

No. 13005.        William F. Miller.

In October, after the defendant had rented the whole house on Floyd street, a literary bureau, under the management of Cecil Leslie, was added, and circular letters were issued, one of which reads as follows:

"To my Depositors: Owing to the enormous success of the Franklin Syndicate in the past, and to the urgent request of a large majority of my depositors, I have decided to incorporate the Franklin Syndicate on December 2nd next, with a capital of $1,000,000. I take this action not alone for the benefit, but for the protection of all investors as well. The names of the incorporators and officers of the Franklin Syndicate will be announced later are the names of men well and favorably known in the financial world. As all depositors are entitled to stock certificates in the corporation, it will be necessary to compare the receipts you now hold with my books, and just as soon as I receive your receipts I will immediately send you your stock certificate to which you are entitled for the same number of shares which you now hold. The holders of the stock certificates in the Franklin Syndicate (Incorporated) will be entitled to all the privileges and profits of each transaction. The Franklin Syndicate (Incorporated) will continue to do business just the same as heretofore, and depositors will not be restricted to their dividends as before. I am positive that all stock certificates will be selling at a very large premium after January 1st, and I desire to say to all those who are not conversant with the dealings of Wall street that such stocks as the American Sugar Refining Company, which pays 12 per cent. a year dividends, is now selling at 155, and it is my belief that the Franklin Syndicate shares will be selling at $400 to $500 a share before March 1st next. I shall continue to receive deposits the same as heretofore until January 1st. After December 2nd, which is the day of incorporation, I shall open no new accounts for less than $50. All accounts which I now have of less than $50 will have to deposit sufficient to make their account $50, or they will not be taken into the new corporation on January 1st. Their money now on deposit will be paid them. Everybody is requested to send or bring in their certificates immediately, so as to facilitate the exchange. In conclusion I desire to congratulate all those who have been depositors in the Franklin Syndicate on the wonderful success the Franklin has had under my management, and I shall continue in the future to give you my very best efforts, as in the past.

"Yours very truly,        William F. Miller.

"P. S. The stock of the Franklin Syndicate (Incorporated) is full paid and nonassessable, and it is the intention of the Franklin Syndicate (Incorporated) to continue paying 10% a week."

There never was an incorporation such as was described in this letter. In another letter he said:

"My intention is to make the Franklin Syndicate one of the largest and strongest syndicates operating in Wall street, which will enable us to manipulate stocks, putting them up or down as we desire, and which will make our profits five times more than they are now. As to that I have no doubt, for it benefits its investors by paying weekly dividends, and doubles their money in a very short time.

      "Yours truly,                       Wm. F. Miller."

Another letter contained the following sentences:

"We also guarantee you against loss, there being absolutely no risk of losing, as we depend entirely on inside information. The information we receive comes from most reliable sources, which fact many who have dealings with us can substantiate. Our business is honest, safe, legitimate, and profitable. This has been satisfactorily demonstrated to all our customers.

"An Investment of Ten Dollars

| | | | | | | |
|---|---|---|---|---|---|---|
| $10 | will give you a profit of | | | $1 | and upwards each week. | |
| 100 | " | " | " | 10 | " | " |
| 500 | " | " | " | 50 | " | " |
| 1,000 | " | " | " | 100 | " | " |

"This may look impossible to you, but you know there must be a way where one can double their money in a short time, or else there would be no Jay Gould, Vanderbilt, or Flower Syndicate, and other millionaires and syndicates who have made their fortune in Wall street, starting with almost nothing."

Intending depositors were referred, among other persons, to Bragge, Bergstrom, Hartman, Heber, and Brandt as customers with whom the defendant had dealt, and many letters of inquiry were received and answered by them, some being typewritten letters furnished to them by the defendant. In other letters sent out by Miller occur the following:

"The equilibrata of Wall street is maintained by the fluctuations between the vast army of losers and the privileged few who win. * * * This profit, undoubtedly, seems phenomenal to you, but it is a mere drop in the bucket to those accustomed to the enormous gains noted in the gigantic deals on the exchange floors of this city. You ask how we do it, and from whence we obtain our exclusive information to so successfully and continuously maneuver our operation. Therein lies the secret of it all. Our 'inside tips' are from the fountain head of speculative interests, and never fail us. This advantage we not only possess here, but over the Washington wire as well. * * * This concern has been in operation during the past eight years, during which time it has enjoyed the confidence of the most conservative moneyed institutions. * * * The investor assumes no liability, his money being treated as a simple deposit, which is guarantied against loss by the immense surplus fund of the Franklin especially reserved for that purpose."

Besides the circulars, a number of "slips" were issued, and placed in envelopes in which the dividend checks were sent to depositors, and these were scattered over the whole country. Some of them are headed respectively: "Confidential 'tip' to Our Friends," "Another Chance For You," "Timely Hint to Investors," "Franklin Syndicate," "Observe This Fact," "A Big Profit Certain." Not satisfied with his circulars and slips, the defendant secured the services of a newspaper advertising agent, who inserted advertisements in 600 or 700 newspapers, with defendant paying therefor about $32,-

000. Miller also secured the insertion in various financial and other newspapers of articles, one of which, taken from a Western paper, was headed:

"Wall Street Astonished. William F. Miller's Franklin Syndicate a Big Winner. 10 Per Cent. a Week Profit. All Former Efforts in Financial Operations Eclipsed by a New Wizard in the Realms of Stock Manipulation."

The article refers to the defendant as "the Napoleon of Finance" and it was hinted that he had received pointers from the "senatorial clique" at Washington. This article is signed by Leslie. Many other notices were published in various newspapers, among them the New York Mercantile Financial Examiner, for all of which Miller paid liberal sums of money. On November 16th he gave one of his employés a telegram, to be sent to all of the subscribers, reading as follows:

"Important. We have inside information of a big transaction to begin Saturday or Monday morning. Big profits. Remit at once, so as to secure the profits.                    William F. Miller, Franklin Syndicate."

This employé took to the telegraph office a list of the names of 10,000 persons to whom the telegram was to be sent at the expense of the receivers. The defendant deposited $300 to pay for uncollected messages, and the message was actually sent to 1,488 persons. In October and November large sums of money were received daily, the scheme having reached its greatest success. There were over 12,000 subscribers. At first accounts were kept in books, but, owing to the multitude of deposits, a case or slip system was substituted. The defendant employed many clerks, working from early in the morning till late at night. Crowds of depositors appeared at the house; some to deposit money, and others to receive their dividends. They extended in long lines from the office to the street, awaiting their turns, each in sight of the other; those depositing receiving encouragement to deposit by seeing the dividend drawers taking their profits. At one time the front stoop broke down on account of the crowds. Money was strewn in packages in drawers and about the floor of the office. The defendant's books and slips show that during October and November the sums received daily often amounted to from $20,000 to more than $63,000, and the whole amount actually due depositors on November 24th was $1,156,000. Bank accounts were opened with various banks and with the Wells Fargo Express Company for the purpose of collecting out of town subscriptions. It is manifest that the weekly dividends, which sometimes amounted to $12,000, were paid out of the current receipts, but, notwithstanding this, the balance of money had increased to such an extent that on November 16th the defendant bought $60,000 in United States bonds, and on November 21st $40,000. On the latter day he purchased a certificate of deposit of $100,000. About October 16th Schlessinger appeared upon the scene, and the proceeds were divided between him and the defendant; Schlessinger receiving on November 16th, for one month's share, one-third, and the defendant two-thirds. It appears by the defendant's books that Schlessinger, at the latter date, received $144,718 and Miller $289,-

436. The only dealing in stocks which appears in the evidence was a deposit of $1,000 with a firm of brokers as a margin for speculation, the enterprise resulting in a loss of the entire amount with the exception of $5.36. About November 21st the defendant's operations had attracted the attention of the Daily Press, and partly through comments therein, and the visits of reporters, and the publicity given thereby, the entire scheme collapsed on the 24th of November, when Miller made a voluntary assignment to Daly, one of his employés, for the benefit of creditors, and fled to Canada. The police took possession of the premises.

The evidence thus summarized was sufficient to require the submission to the jury of the question whether or not the defendant intended to deprive Mrs. Moeser of the $1,000, or intended to appropriate the same to his own use; and whether or not he obtained the money by color or aid of fraudulent or false representations or pretenses, and whether or not he appropriated the money to his own use.

Coming now to the connection of the complainant, Mrs. Moeser, with the scheme, it appears that on October 12th she gave one Wilson $100, which he deposited for her, receiving the usual receipt. She drew her weekly dividend upon this amount, and on November 16th deposited the $1,000 mentioned in the indictment. Upon her first deposit of $100 she received four or five payments, and testified that when she put in the $1,000 she expected to receive the same dividend of 10 per cent. weekly. She had read in the papers the references to Vanderbilt and Gould and the moneymakers of Wall street. At the time of the deposit of $1,000 she had not received or read any circulars, but saw them lying about Miller's office. I do not find it necessary to discuss the question whether Mrs. Moeser parted with her money on the faith of any representations made directly to her by the defendant. It is sufficient if there was a fraudulent or false representation or pretense by color or aid of which she was induced to part with the possession of the money; that is, if the defendant put before the public a scheme the general knowledge of which came to her, and she was induced thereby to deposit the $1,-000 with the defendant for the purposes of such scheme, he obtained possession of her money by color or aid of such scheme. Her testimony is that two weeks before she deposited her $100 on October 12th she heard of the Franklin Syndicate, and authorized Wilson to put in the money, and that he brought her back a receipt reading as follows:

"Received from C. Wilson the sum of one hundred dollars ($100.00) for a ten-share interest in the Franklin Syndicate. Principal guarantied against loss, and may be withdrawn at any time upon one week's notice and the return of this receipt. Dividends payable weekly in sums of one dollar and upwards per share until principal is withdrawn.

"William F. Miller."

On this deposit she drew $10 a week for five weeks. Afterwards she went to the house "to see how people were going there to put any money in." She subsequently made the $1,000 deposit personally, and received a receipt from the defendant, reading as follows:

"Brooklyn, New York, Nov. 16, 1899.

"Received from Catherine Moeser the sum of one thousand dollars for an interest in the Franklin Syndicate. Principal guarantied against loss by surplus, and can be withdrawn at any time upon one week's notice and the return of this receipt. 10 per cent. interest paid weekly on this deposit until principal is withdrawn.

"No. 12,217.       William F. Miller."

She asked him if he would insure the money, and he said "the coupon was insurance enough." She saw circulars lying about, but did not take any. She says, however, that they had a headline and picture like those in evidence. Wilson, who made the first deposit for her, had himself invested $130. In the latter part of September or the beginning of October he received a copy of the New York Mercantile Financial Examiner, containing the article already referred to, but does not say that he showed it to Mrs. Moeser. She gave him the $100 to invest, and he paid it to the defendant, and received the receipt therefor, which he gave to Mrs. Moeser. When the $1,000 was paid in, he told Mrs. Moeser:

"'You are taking an awful risk.' That, 'If you lose it, don't blame me, because I don't want you to blame me after.' She said, 'You say it is all right.' I said: 'What I can see it is. The money is coming in fast there, and you will have a chance to win out.' So she said, 'I will put the money in.' "

From this testimony the jury had the right to infer that the defendant's scheme, known generally as the "Franklin Syndicate," had been made public by him; that Wilson knew of it; that Mrs. Moeser had learned of it, and was induced to invest her $100, receiving a certificate or "coupon" bearing the name of the Franklin Syndicate, promising to pay 10 per cent. weekly; that she received her weekly installments for five weeks, and thereupon made her second investment, of $1,000, induced thereto by her general knowledge of the scheme, by the apparent success of her first investment, by the payment to her of weekly dividends on that investment, and by the general appearance of what was going on at the syndicate headquarters; that the scheme of the defendant was a false and fraudulent representation or pretense that he had the ability to pay 10 per cent. weekly; that the scheme was put forth for the purpose of accomplishing precisely what it did accomplish; and that the defendant obtained the money from Mrs. Moeser by color or aid of the scheme which he had published, and that the scheme was a false and fraudulent pretense, artifice, device, or trick. It is a familiar rule that a person is presumed to intend the natural consequences of his acts. It cannot be doubted that it was the intention of the defendant that his statements, receipts, circulars, publications, and regular, though temporary, payment of dividends should secure the deposit of money with him. There was ample evidence to justify the inference that he was propounding a preposterous scheme of "device, trick, artifice, fraud, or false pretense," and that he obtained the money from Mrs. Moeser intending at the time to appropriate it to his own use, and that subsequently he did so appropriate it.

In view of what is said in the early part of my opinion as to the construction of section 528 of the Penal Code, I do not deem it es-

sential to do more than refer to the charge of the court in which the jury were instructed that, in order to find the defendant guilty of larceny, they must find that Mrs. Moeser did not intend to part with title to or dominion over the $1,000 when she delivered it to Miller, and that they must also find that he intended to apply it to his own use, and to deprive her of the money. This charge was certainly most favorable to the defendant. The appellant's counsel also contend that it was error to admit evidence of transactions with other persons of a similar character to that with Mrs. Moeser. The court admitted the testimony to show the intent of the defendant, and there is abundant authority for the ruling. Weyman v. People, 4 Hun, 511; People v. Peckens, 153 N. Y. 577, 47 N. E. 883; Mayer v. People, 80 N. Y. 364.

One exception to the charge requires consideration. Defendant's counsel requested the court to charge the jury that:

"They must find, in order to convict the defendant, that at the time he received the money from Mrs. Moeser he formed the intent to steal it. By the Court: I decline that charge in its present shape. If at any time prior to the 24th of November he conceived the idea of appropriating it, he is guilty of larceny. By Mr. Ridgway: We except to the court's refusal to charge as requested, as well as the court's qualification and modification there."

If I have heretofore correctly analyzed the statute, the request was properly refused, for, under my fourth division, "if the defendant, with intent to deprive or defraud Mrs. Moeser of her money, appropriated the same to his own use," he stole the same, and is guilty of larceny. It was not error to decline a request to charge that the intent to steal must be coincident with the reception of the money, for intent to steal might also be connected with the appropriation. Hence an intent to appropriate, conceived at any time prior to November 24th, the date of the appropriation, was sufficient to sustain the charge of the indictment, and the refusal to charge as requested was not error. It was also in accord with the rule laid down in People v. Laurence, supra, quoted above.

I find no failure of evidence sufficient to convict the defendant of the crime of larceny as defined by section 528 of the Penal Code, and no reversible error in the charge, or in the admission or exclusion of evidence, or in the denial of the several motions of the defendant.

The judgment of conviction should be affirmed.