## Court of Appeals.

January 14, 1902.

## THE PEOPLE v. WILLIAM F. MILLER.

(169 N. Y. 339.)

1. APPEAL—CONSTITUTION, SECTION 9, ARTICLE 6.

An appeal from an order granting a new trial in a criminal case is not affected by section 9 of article 6 of the constitution, as the limitation upon appeals to the Court of Appeals contained in that section applies to civil cases only, and section 519, Code Criminal Procedure, gave an appeal to the people as a matter of right.

2. INDICTMENT—LARCENY.

An indictment in the common law form charging larceny is still good, and defendant's conviction can be upheld if the charge was sustained at the trial by the proofs.

3. LARCENY—PENAL CODE, SECTION 528.

The offense of larceny at common law is established by proof on the part of the prosecution, showing that the defendant obtained possession of the property by some trick, fraudulent device or artifice, *animo furandi,* with the intention at the time of subsequently appropriating it to his own use.

4. SAME—OBTAINING MONEY BY FALSE PRETENSES.

False pretenses, as understood in the criminal law, as a means of obtaining the title or possession of money or personal property, imports an intentional false statement concerning a material matter of fact upon which the complainant relied in parting with the property or in delivering the possession, where the defendant's crime consisted of obtaining money by false statements, all promissory in nature and character, and in persuading depositors of money that he would obtain large dividends on their money through inside information in the stock market, it does not constitute the crime of obtaining money by false pretenses.

5. TRIAL—FALSE PRETENSES A PART OF THE TRICK.

The court charged that the defendant would be guilty of larceny if he obtained money by false pretenses, as a part of the device or scheme, trick or artifice, intending to appropriate it to his own use. Defendant's counsel requested the court to charge that if the defendant obtained the money by false representations he could not be convicted under the indictment, which was refused. Held, no error.

6. SAME.

The defendant's counsel also requested the court to charge the jury that in order to convict the defendant they must find that at the time he received the money he formed an intent to steal it, which was refused, but the court charged that defendant was guilty of larceny if he formed an intend to steal it prior to a date named, which was subsequent to the receipt of the money. Held, while technically an error, it could not have prejudiced defendant's rights, as the evidence in the case permitted of but one inference as to defendant's purpose, and that was that he intended to appropriate the money at the time he received it.

APPEAL from an order of the Appellate Division of the Supreme Court in the Second Judicial Department, made October 11, 1901, reversing a judgment of the Kings County Court rendered upon a verdict convicting the defendant of the crime of grand larceny in the first degree.

The facts so far as material, are stated in the opinion.

John F. Clarke and Martin W. Littleton, for appellant.

Frederick B. House, Louis J. Vorhaus and R. A. Ammon, for respondent.

O'BRIEN, J.: The defendant was convicted of the crime of grand larceny and sentenced to imprisonment in the state prison

for ten years, but upon appeal the court below has reversed the judgment of conviction and granted a new trial, and the People have appealed to this court from that order. If this were a civil action the case would not be appealable to this court, since by section nine of article six of the Constitution, appeals to this court are limited to three classes of cases, namely, final judgments in actions, final orders in special proceedings and orders granting new trials on exceptions where the appellant stipulates that on affirmance judgment absolute shall be rendered against him. It is obvious that the appeal in this case does not fall within any of the three classes specified. It is an appeal from an order granting a new trial in a criminal case, and if the limitations upon appeals to this court, specified in this provision of the Constitution, have any application to criminal cases, then clearly this court would have no jurisdiction to review the order in question, but we think that it is very obvious from the language of the limitations themselves that they have no application to appeals in criminal cases. It is true that judgments in capital cases are excepted from the operation of this provision of the Constitution. The exception was probably unnecessary and inserted in the text from abundant caution, otherwise, as supposed, it might be claimed that appeals in such cases directly from the trial court had been abolished and our right to review the facts in such cases abrogated. The exception was, therefore, inserted in order to preserve the right of appeal in such cases, as it existed before the recent Constitution was enacted. This was the plain purpose of the reference in the section to capital cases, and the fact that an unnecessary exception in regard to such cases was inserted in the provision cannot, of course, include within the limitations other criminal cases not referred to. The limitation upon appeals to this court contained in that section manifestly applies to civil cases only. Nothing contrary to this proposition was decided in People v. Helmer, 154 N. Y. 596, though certainly the question was discussed. But it will be seen by an examination of the case that no question of jurisdic-

tion was involved or decided, and the subsequent decisions in this court indicate very clearly that there was no intention to decide any such proposition in that case. People v. Willis, 158 N. Y. 392; People v. Klipfel, 160 N. Y. 371; People v. Kane, 161 N. Y. 380; People v. Drayton, 168 N. Y. 10. In the three cases first cited it will be seen that this court could not have taken jurisdiction of the appeal if the limitations prescribed in the Constitution had any application; and in the case last cited it was expressly stated in the opinion that the limitations referred to have no application to a criminal case, and that the jurisdiction of this court to hear appeals of this character rests entirely upon the provisions of section five hundred and nineteen of the Code of Criminal Procedure, re-enacted since the present Constitution went into effect. This section gives an appeal in this case to the People as matter of right, and so we have no doubt as to our jurisdiction to review the order in question.

The indictment charged the defendant with grand larceny in two counts. The first count charged the defendant with a felonious appropriation to his own use of one thousand dollars in money which he then and there had in his possession, custody and control as bailee, servant, attorney, agent, clerk and trustee of the complainant. This charge was abandoned on the trial and no further reference need be made to this count in the indictment. The second count charges the defendant with larceny in the common-law form, namely, that "on the sixteenth day of November, in the year of our Lord one thousand eight hundred and ninety-nine, at the borough and in the county aforesaid, with force and arms, one thousand dollars in the money and lawful currency of the United States of the value of one thousand dollars of the goods and chattels and property of one Catherine Moser, then and there being found, feloniously did steal, take and carry away, to the great damage of the said Catherine Moser, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity."

The defendant was, therefore, charged with the crime of which he was convicted in proper form. An indictment in the common-law form charging larceny is still good, and the defendant's conviction can be upheld if the charge was sustained at the trial by the proofs. It is stated in the order appealed from that the judgment was reversed for errors of law and not for errors or questions of fact, or as matter of discretion, and that the court had reviewed and considered all the questions of fact in the case and found no error therein. This provision of the order means, of course, that the learned court below had examined the evidence given at the trial to prove the various acts and doings of the defendant, which it is claimed constituted the crime charged and found that they were sufficiently established, but reversed the judgment on questions of law. In this aspect of the case the duty of this court is very clear and simple. We are to determine whether there is any evidence in the record which could properly have been submitted to the jury in support of the charge of larceny, and if so, whether there are any exceptions to the rulings of the court upon the trial which warranted the learned court below in reversing the judgment. The fundamental question in the case is whether the proof given at the trial and embraced in the record now before us warranted the trial court in submitting the case to the jury. The defendant's counsel, at the close of the evidence, requested the court to discharge the defendant and dismiss the indictment, upon the ground that no proof had been given to sustain the charge of a common-law larceny, and his request in this respect was denied and exception taken. The same point was raised by other requests before the case was finally submitted to the jury.

The evidence at the trial to prove the offense charged took a wide range and covered a broad field of inquiry, and although it related to only about eight months of the defendant's career, there is little, if any, dispute about the facts. They are stated very fully and fairly in the two opinions rendered in the court below (64 App. Div. 450), and, therefore, a mere general out-

line of the defendant's transactions will be quite sufficient here for all the purposes of this appeal. The defendant's first appearance before the public was as a member of a prominent church in Brooklyn, in the work of which he seems to have taken an active part, since he was at one time the president of the Christian Endeavor Society. His standing in the church gave him the opportunity to form the acquaintance of the young men attending the Sunday school, with many of whom he was soon on intimate terms. Many of these young men became his first victims or customers in a financial scheme which he had formed in order to appropriate to himself the money of the credulous and unwary. His plan was first put into operation in a very simple way in March, 1899, when he announced that he possessed such means of obtaining inside information of great money-making operations in the New York Stock Exchange and the exchange in other cities that he was able to make and pay large profits to parties who would deposit money with him. The scheme proposed to depositors by defendant was that for every ten dollars or more deposited with him he would pay ten per cent. weekly until the deposit was withdrawn. The depositor was to be guaranteed against loss by what he called surplus and the deposit could be withdrawn at any time upon a notice of one week. He represented himself as the manager of what is styled the " Franklin Syndicate," and all his advertisements, circulars and receipts had upon their face a picture or portrait of Dr. Franklin, under which was printed one of the apothegms attributed to that eminent philosopher, namely: " The way to wealth is as plain as the road to market." At first he carried on his operations in a candy store, where he met such persons as he was able to persuade to invest, but as soon as the project had fairly started he engaged the top floor of a two-story house in a residential district. This place for the conduct of his operations is described by one of the witnesses as a small hall room with three chairs, a small table, a desk and a safe. He paid the promised weekly dividend promptly and the allurement of such enormous profits made

every depositor a missionary to propagate the new theory by means of which wealth could be easily and speedily attained. The scheme, of course, could not succeed without a constant accession of new depositors, and they came. The project grew and expanded with amazing rapidity. The wildest dreams that the defendant could possibly have entertained were more than realized. In the month of October following the commencement of his operations, he was obliged to rent the whole house, and there he established a correspondence and literary bureau under the management of a person who understood the way to reach the public through the public press, as well as by attractive advertisements, circulars and other publications that were scattered broadcast throughout the city, the country, and were sent even to foreign lands. Immense sums of money were expended in purchasing space in the public press, and even in financial periodicals, announcing the amazing success of the project. The public throughout the country read and believed, a striking proof of the extent to which men may be influenced even in their pecuniary interests by the organs of public opinion. When the checks for dividends were sent out to the depositors, they were always accompanied by circulars or newspapers containing highly colored descriptions of the astonishing success of what was called the "Syndicate." In October and November the scheme had reached its highest development. The house was filled with clerks, all working from nine in the morning until ten at night, drawing dividend checks, receiving money and sending out circulars and newspapers. The streets were daily crowded with depositors; two lines were daily formed, one of depositors and the other to draw dividends, and, of course, the depositors were encouraged by the success of their neighbors who were receiving such enormous rewards. Money was piled in heaps about the place, upon the counter and the floor. People remained in the line for hours waiting their turn to reach the house to deposit their money. The crush was so great, as the proof tended to show, that the stoop broke down and a new one had to be erected. Money was received to the

amount of over sixty thousand dollars on some days. The mail brought from all parts of the country, daily, hundreds of letters containing deposits, and twenty or more clerks were employed writing dividend checks, the defendant's name being attached by means of a rubber stamp. On some days the dividends paid out amounted to as much as thirteen thousand dollars. No books were kept and no stocks or collateral were ever seen. The place had no telephone or any of the furnishings of an ordinary office. At one time highly colored advertisements were inserted in six or seven hundred papers throughout the United States, for which the defendant paid over twenty thousand dollors. The character of these advertisements need not be stated. It is sufficient to say that they were so framed as to attract the ignorant and credulous. About the twenty-fourth of November, 1899, a little more than eight months from the time that the scheme was first put into execution, the defendant had received over one million dollars in deposits from over twelve thousand depositors throughout the United States, Canada, and there were even a few from Europe. He had paid out large sums of money in dividends, as that was an esential part of the scheme; but he had been so successful in reaching the ear of the public that he had on hand large sums of money. On the date last mentioned he closed the concern, made a general assignment for the benefit of creditors and fled to Canada, taking with him one hundred thousand dollars in United States bonds, which he had just purchased, and the proceeds of a bank certificate of deposit for the same amount, which he procured to be cashed. This in brief is the history of the defendant's operations, and, although they savor more of romance than reality, the facts were established at the trial by incontestable proof. The defendant never in fact had any connection with the stock exchange, and did not purchase or deal in securities of any kind. He had in fact no business except the preparation and distribution of circulars and advertisements, the receipt of money from the various depositors and the distribution of the so-called dividends. The whole project from beginning to end was a transparent swindle.

The complainant in this case was one of the persons induced to become a depositor by the flattering promise of large dividends which the defendant held out to the public through the press and otherwise. On the twelfth of October, 1899, she deposited one hundred dollars and received a weekly dividend of ten dollars until about the time that the concern collapsed. On the sixteenth of November she was induced to deposit with the defendant the one thousand dollars mentioned in the indictment. She received a receipt therefor, which was numbered 12,217. The receipt on its face purported to give her an interest in the Franklin Syndicate. It stated that the principal was guaranteed against loss by surplus, and that it could be withdrawn at any time upon one week's notice and the return of the receipt, and that ten per cent. would be paid weekly on the deposit until the principal was withdrawn. The circumstances under which she delivered the money to the defendant will appear from her own statement of the transaction: " After reaching the place where Miller was sitting I gave him my thousand dollars. This thousand dollars was in United States currency; it was in bills. I do not wish to mention where I got the thousand dollars from. I asked him if he would insure the money against loss, and he said the coupon was insurance enough. By the coupon he referred to the paper which he gave me. . . . No person acting for the defendant asked me to put in the thousand dollars. I conceived the idea myself that it would be a good thing to put in a thousand dollars and receive a hundred dollars a week interest. . . . There was no representation made to me from the Syndicate, but I read something in the papers somewhere, I do not know where, that Vanderbilt, Gould and all of them made money in Wall street. I knew this was true and I thought this money was to be used for the same purpose, and I would get the benefit of it." There can be no doubt that the complainant delivered the money to the defendant for the purpose of speculation, with the understanding that the deposit should be re-

turned with the accumulated profits, and had the defendant actually used the money in speculation, however improvident or reckless, and lost, his act would not amount to larceny. But it is plain that he never intended to use the money in speculation. The sole purpose of the pretense and device referred to was to enable him to get possession of the money of others and to appropriate it to his own use. ' The jury could have so found, and their verdict imports such a finding. The jury were authorized to find and by their verdict have found that the complainant did not intend to part with the title or the possession of the money, but merely to give the defendant the custody of it for the purposes specified. It was competent for them to find that the complainant did not intend to part with her title to the money to the defendant, and while she may have intended that he could give title to it to some third person, in order to engage in speculation, yet as nothing of that kind actually happened, or was intended on the part of the defendant, that consideration is of no importance. The real question is whether, upon any view of the evidence which the jury was authorized to take, the defendant could be convicted of larceny as that offense was known at common law. If so, then the verdict should be sustained.

Larceny as defined by section five hundred and twenty-eight of the Penal Code embraces every act which was larceny at common law besides other offenses which were formerly indictable as false pretenses or embezzlement. The offense of larceny at common law is established by proof on the part of the prosecution showing that the defendant obtained possession of the property by some trick, fraudulent device or artifice, *animo furandi*, with the intention at the time of subsequently appropriating it to his own use. This proposition is well sustained by authority in this and other courts both before and since the enactment of the Penal Code. People . v. Laurence, 137 N. Y. 517; People v. Morse, 99 N. Y. 662; Justices, etc., v. People ex rel. Henderson, 90 N. Y. 12; Loomis

v. People, 67 N. Y. 322; Hildebrand v. People, 56 N. Y. 394; Smith v. People, 53 N. Y. 111; People v. McDonald, 43 N. Y. 61; Com. v. Barry, 124 Mass. 325; Reg. v. Buchmaster, 16 Cox C. C. 339. We think that the jury could find upon the proofs in this case, and must be deemed to have found by their verdict, that the defendant received the money in question by means of a trick, device or artifice, with the intention at the time of appropriating it to his own use. The manner in which the defendant obtained possession of the money was none the less a fraudulent device, trick or artifice because his operations were conducted upon a large scale and assumed some of the forms of business. It was plainly intended from the beginning and at every stage of the defendant's operations to get possession of the money of others by means of fraudulent devices and then appropriate it to his own use. This was larceny at common law and is still larceny under the Penal Code. The cases cited above sustain this proposition and differ in no essential respect from the case at bar.

The learned counsel for the defendant contends that the proof in this case established no criminal offense other than obtaining money by fraudulent pretenses, and since that offense was not stated in the indictment the defendant was improperly convicted, and such was evidently the view of the majority of the learned court below. It is very doubtful, however, if such a charge could be sustained by the proof in this case. False pretenses as understood in the criminal law, as a means of obtaining the title or possession of money or personal property, imports an intentional false statement concerning a material matter of fact upon which the complainant relied in parting with the property or in delivering the possession. It would be difficult to show that the defendant in this case made any material false statement concerning any existing fact. His statements were all promissory in nature and character. He represented to the public very little if anything concerning any fact existing at the time. His statements consisted in persuading the depositors that he could and would obtain for the use

of their money large profits in the form of dividends. These statements were all in the nature of promises, and although they were very effective in producing the result desired by the defendant, they would hardly constitute the basis for a criminal charge of obtaining money by false pretenses. Ranney v. People, 22 N. Y. 413; People v. Blanchard, 90 N. Y. 314; People v. Baker, 96 N. Y. 340, 348; Therasson v. People, 82 N. Y. 238. Under these authorities it would be very difficult to frame an indictment against the defendant for obtaining money by false pretenses, or to sustain it by proof at the trial. The distinction between larceny, false pretenses, and embezzlement was concisely stated in the brief opinion of the court in Commonwealth v. Barry, supra. " If a person honestly receives the possession of the goods, chattels, or money of another upon any trust, express or implied, and, after receiving them, fraudulently converts them to his own use, he may be guilty of the crime of embezzlement, but cannot be of that of larceny, except as 'embezzlement is by statute made larceny. If the possession of such property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offense is that of obtaining property by false pretenses, provided the means by which they are acquired are such as in law are false pretenses. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely, and not with his title to the property, the offense is larceny." In this case the complainant's money was not obtained by the defendant by such means or representations as in the criminal law constitute false pretenses. But the jury could have found that he did obtain the money by means of a fraudulent device, with the intent on his part at the time he received it to convert it to his own use; and also that the complainant intended to part with her possession merely and not with the title, and so the verdict convicting the defendant of larceny was warranted by the evidence.

The case of People v. Dumar, 106 N. Y. 502, does not support the contention of the learned counsel for the defendant that the proof in this case was not sufficient to warrant a conviction for larceny. It was held in that case that the charge of larceny in the common-law form could not be sustained by proof that the defendant obtained possession of the property from the owner upon a sale on credit induced by false and fraudulent representations. It will be seen that in that case there was a false representation concerning a material fact upon which the person parting with the property relied, and, hence, the real offense was false pretenses and not larceny as it was understood at common law. The defendant in that case could have been indicted for false pretenses, since the false statements related to facts and were not as here promissory in their character. The case at bar cannot be distinguished in any essential respect from that of People v. Laurence, supra. The only distinction that can be made is that the complainant in the case referred to, when parting with the cars, could not have intended to part with the title, but on the contrary it intended that the identical cars should be returned when the necessary changes were made. But in the case at bar the thing delivered to the defendant was money, which has no ear-mark. It lost its identity when delivered to the defendant, and the complainant, of course, could not have intended that the identical bills which were delivered to the defendant should be returned to her. The difference in the two cases, if any, is founded entirely upon the different character of the property which the accused obtained. That distinction would not seem to be material. The defendant in that case as in this got possession of the property by means of a false pretense or fraudulent device promissory in character, and, therefore, not amounting to the crime of false pretenses or embezzlement, but since in both cases his intent at the time was to appropriate the thing to his own use it was common-law larceny. In both cases the fraudulent device consisted in deceiving the owner of the property, not as to any existing fact, but with respect to intentions

as to future operations with the property. The fact that in the case referred to the thing stolen was a car and in this case money can make no difference, since the owner in both cases parted with the property and the accused obtained it under circumstances essentially the same. The offense which the defendant was guilty of was larceny rather than false pretenses or embezzlement, since he procured the money by operating upon the minds of depositors by promises of large profits as a fraudulent device to get possession of the money and there was no agency, bailment or trust to give any color of right to his original possession. Moreover, the same act may sometimes amount to larceny at common law and embezzlement under the statute, and when it does the offender may be prosecuted upon either charge, at the option of the People, when the two offenses are of the same grade and do not require a different measure of punishment. 2 Bishop's Cr. Law (7th ed.), secs. 328, 329, and notes. We are, therefore, of the opinion that the evidence was sufficient to submit to the jury on the charge of larceny and that it sustains the verdict.

The distinction between larceny and false pretenses is well illustrated by the case of Zink v. People, 77 N. Y. 114. In that case it was held, after a most thorough discussion of the authorities, that the offense committed by the accused was false pretenses and not larceny. The reasons for that conclusion are very plain and obvious. The accused was indicted and convicted for selling a large quantity of malt which had been shipped to him in New York from Ohio. The property was accompanied by a bill of lading, which was delivered to the accused, and vested in him the legal title and possession of the property. The shipper intended to vest the consignee with the title so as to enable him to sell the property and account for the proceeds. Beyond all doubt the owner in that case intended to part and did part with the legal title and possession of the property. The accused intended to acquire the title and possession, otherwise the transaction which contemplated a sale and delivery of the malt to third parties could not have

been effectuated at all. The legal title and possession of the property having passed to the accused he could not, of course, have been guilty of larceny, although the transaction in the first instance might have been induced by false representations. But the case at bar presents an entirely different transaction. The complainant did nothing except to deliver the money to the defendant. She did not intend to loan it to him or to vest him with the title, but with the custody only, and that for a specific purpose. It was very much like the transaction in the Morse case, *supra,* where the money deposited was to be returned, and where its appropriation by the custodian to her own use was held to be larceny. The complainant in the case at bar undoubtedly intended to part with the manual possession of the money, but even that purpose and intention on her part was the result of a trick or fraudulent device on the part of the defendant. Her consent to part with the manual possession of the money having been procured by the defendant's fraudulent device, it was in law no consent at all. The fact that the plaintiff was led to believe that the defendant was the manager of a syndicate or corporation only emphasizes the nature and character of the device, since there was in fact neither a corporation nor a syndicate, but the defendant was conducting the operations as an individual under color of names and titles intended only to deceive. I have not been able to find any case of controlling authority where it was held that the transactions amounted to false pretenses on the part of the accused as distinguished from common-law larceny, that is not readily distinguishable from the case at bar upon the facts.

The only exceptions in the record that call for any notice here were taken to the charge of the learned trial judge, and his refusal to charge certain propositions presented by the learned counsel for the defendant. After the jury had deliberated for some time they came into court for further instructions and for an explanation of a part of the charge as made which they stated to the court. In response to the request the court charged, in substance, that the defendant would be guilty

of larceny if he obtained money by false pretenses as a part of the device or scheme, trick or artifice, intending to appropriate it to his own use. The defendant's counsel requested the court to charge that if the defendant obtained the money by false representations he could not be convicted under the indictment, which request was refused, and the defendant's counsel excepted. We do not think that this exception presents any legal error. It is based wholly on the statutory meaning of the terms "false representations" and "false pretenses." False pretenses in the general sense, as distinguished from the statutory sense, are necessarily a part of every device, trick or artifice for feloniously obtaining the possession of money or property, and what the court stated was that if the defendant obtained the money by such device, though it involved a false pretense in the general sense, it could be found to be larceny. So, also, false representations, as the defendant's counsel used the term and as the court understood it, do not necessarily imply an indictable fraud, since we have seen that the false statement in that case must relate to some existing material fact. The false pretenses referred to in the charge and the request were evidently those false promises of large profits held out by the defendant to the depositors, and as they were not indictable and only constituted a part of the trick or artifice, the exception is not good.

The defendant's counsel also requested the court to charge the jury that in order to convict the defendant they must find that at the time he received the money he formed an intent to steal it. This request was refused, and the court charged that the defendant was guilty of larceny if he formed such intent at any time prior to the twenty-fourth of November, and an exception to the refusal and to the charge as made was taken. Considered as an abstract legal proposition, the request was doubtless correct, and if the refusal of the learned trial judge to charge it could possibly have prejudiced the defendant, the reversal of the judgment by the learned court below would have to be sustained. But it is plain, we think, that

the refusal to charge this proposition, and the charge as made, could not possibly have prejudiced the rights of the defendant. The evidence in the case really permitted but one inference as to the defendant's purpose, and that was that he intended to appropriate the money at the time he received it, and whatever intention is imputable to him must necessarily have existed at the time that the money was delivered to him. The jury could not have found upon the evidence that he then received it innocently or rightfully, and that during the seven or eight days that followed, preceding the collapse, formed for the first time the intention of converting it to his own use. There was nothing in the proof to authorize the jury to find that the intent to steal was formed subsequent to the receipt of the money. Manifestly, he entertained that purpose at the time that the money was delivered to him, or he never entertained it. Moreover, the exceptions referred to, we think, come fairly within the scope of section five hundred and forty-two of the Code of Criminal Procedure, which requires the court to give judgment without regard to technical errors or defects, or exceptions which do not affect the substantial rights of the parties. Our conclusion, therefore, is that the order of the Appellate Division should be reversed and the judgment of conviction affirmed.

PARKER, Ch. J., GRAY, HAIGHT, LANDON, CULLEN and WERNER, JJ., concur.

Ordered accordingly.

---

### Supreme Court — Special Term, Kings County.
January, 1902.

## THE PEOPLE v. EDWARD G. GLENNON.
(37 Misc. 1.)

1. POLICE—ARREST BY, WITHOUT WARRANT.

The only exception to the rule that a policeman has no greater right than a citizen to arrest without a warrant is that where a felony has in fact been committed, although not in his view, a police-