## C. W. ABBOTT et al. v. STATE.

No. A-10306.    June 7, 1944.
(149 P. 2d 514.)

408

George H. Giddings and Jack Tellegen, both of Oklahoma City, S. E. Dunn, of Tulsa, and David Tant, of Oklahoma City, for plaintiffs in error.

Randell S. Cobb, Atty. Gen., J. Walker Field, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, J. The defendants, C. W. Abbott and James Fletcher, were jointly charged in the district court of Tulsa county, Okla., with the crime of larceny by fraud; were tried, convicted and sentenced to serve terms of five years in the State Penitentiary, and have appealed.

These defendants were charged under Tit. 21 O. S. A. 1941 § 1701, which is as follows:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

It is also provided by § 1709 of said title:

"If the thing stolen consists of any evidence of debt or other instrument, the amount of money due thereon or secured to be paid thereby and remaining unsatisfied, or which in any contingency might be collected thereon, or the value of the property the title to which is shown thereby, or the sum of which might be recorded in the absence thereof, as the case may be, shall be deemed the value of the thing stolen."

See State v. McCray, 15 Okla. Cr. 374, 177 P. 127.

The charging part of the information is as follows:

"That C. W. Abbott and James Fletcher, and each of them, on the eighth day of November, A. D. 1940, in Tulsa County, state of Oklahoma, and within the jurisdiction of this Court, did unlawfully, fraudulently and feloniously, while acting together and in concert each with the other, take, steal and carry away, without the consent of the owner thereof, a certain check in the sum of $1000 and of the value of $1000, in good and lawful money of the United States of America," etc.

For a reversal of the case, it is contended:

"First Proposition. Where an information charges a particular offense, a conviction cannot be had upon evidence of another and distinct offense, not included within the charge.

"Second Proposition. It is error for the prosecuting attorney, in the opening statement, to charge the defendant with collateral crimes or to impute that the defendant is guilty of other crimes which cannot be proved.

"Third Proposition. A prosecuting attorney cannot state his personal opinion as to defendant's guilt or state facts not provided by evidence or otherwise get before the jury that which amounts to the prosecuting attorney's own opinion and testimony."

The consideration of the first proposition necessitates a review of the evidence offered by both the state and the defendants.

There was some conflict in the testimony, but the court having submitted this issue to the jury, and they by returning a verdict of guilty have decided this issue in favor of the state and against the defendants, we are therefore bound by the verdict of the jury, unless it is such that is contrary to the law, or the evidence is insufficient to sustain the same. In this light, the record reveals: That the prosecuting witness, Mrs. Nancy Dickinson, who at the time of the trial was a resident of Tulsa, was a widow and had previously lived at Pawhuska, in Osage county. Her deceased husband had been a member of the Osage Tribe of Indians, and she and her two minor children, both of whom were crippled, had inherited from his estate a considerable sum of money, the exact amount not being revealed by the record. Both of the defendants were residents of Oklahoma City, the defendant Abbott being ostensibly engaged in the automobile business, and the defendant Fletcher in the oil business. Abbott first went to Pawhuska in the early part of 1940, and was introduced to Mrs. Dickinson by Nate Jones, who had a garage in Pawhuska, and in whose garage the automobile of Mrs. Dickinson had been placed for repairs. It was said that Abbott was to become the manager of the Jones garage.

He immediately cultivated the acquaintance of Mrs. Dickinson, in an attempt to sell her a new automobile, and during this time began talking to her about making an oil investment. The evidence reveals that she was absolutely ignorant of the oil business, and had no knowledge of business investments. Knowing that she had settled the estate of her husband, he told her, "I am going to have an estate settled and I am going to put all my money in the oil business." A short while thereafter he took the defendant Fletcher to her place and introduced him. Negotiations were immediately begun to get her in the oil business. The defendant Fletcher exhibited to her a check for $15,000, and told her he represented the Gulf Oil Company, and that the check was given to him by his company to pay for an oil lease in Rogers county. He expressed great interest in Mrs. Dickinson, and especially in her crippled children, whom he desired to help; and proposed that if his friend Abbott and Mrs. Dickinson could purchase the proposed lease in Rogers county for less money than the $15,000, he would endorse the check to them, and they could have the opportunity to make some money, and he would thereby help both of them. He finally proposed that she go with them to near Claremore, in Rogers county, to see the party who was going to sell the lease. Both defendants went to her place about nighttime, and she accompanied them to near Claremore, on at least two occasions. They there contacted the party from whom they proposed to purchase the lease. All of this procedure was very evasive and not at all understood by Mrs. Dickinson. It was represented to her that the party was not very desirous of selling the lease. They met a party at Claremore the next day, but according to the testimony of Mrs. Dickinson, "he did not seem like the same fellow" they had met the night before. She testified: "But he did get in the back

end of the car and said he was going to withdraw that right away if we didn't go ahead and get the lease." Defendant Fletcher told her he wanted to help his friend Abbott and her. He said: "that baby is in a cast, I sure feel sorry for him, and anything I could ever do, I sure want to do, because I sure do love him." With reference to the $15,000 check, which he had, she testified:

"A. What he said. Now this $15,000 he said he didn't care hisself. He said, 'You know I can't do nothing myself, I am for the Company. I get my salary, whether I do anything or not.' But he said, 'I am supposed to take this $15,000, that is what they allowed for that. And you and Abbott can step into this, and if you can get it cheaper, that is up to you and Abbott. He is a good friend of mine and what I have heard,' he said, 'I want to try to help you out.' "

It was understood that defendant Abbott was to secure his part of the $2,000 to be paid for the lease from Oklahoma City, and that he wired for the same. After they returned from Claremore, defendant Abbott went to the home of Mrs. Dickinson, and in an excited manner, said, "You sure got to get me that check." Defendant Fletcher was with him, and she gave them the check for $1,000, made payable to the defendant Abbott. Fletcher said he could not take it, because he was in the company. When the check was given, defendants had her mark thereon, "For loan." She testified: "Well he said put that on there because he wouldn't be suspicioned at the bank." Abbott then told her, "I will get the lease. I will have to work with that fellow and get a lease and then I will record it." She testified: "That is what he said time and again, when I asked him about the lease, he couldn't get it released some way."

We might here state that the prosecuting witness was asked with reference to the securing of other large sums

of money by defendants from Mrs. Dickinson as further payments on this identical lease, on the pretense that they had to pay more for the lease in order to obtain the same. The court sustained an objection to this testimony for the reason that other charges had been filed against these defendants covering those items. We shall make reference to this testimony when considering other contentions of the defendants. But we state here that in our opinion this evidence was clearly admissible as being a part of the same plan and scheme to secure the funds of the prosecuting witness by the defendants.

After the check for $1,000 had been secured by defendants, they executed a promissory note to Mrs. Dickinson for the sum of $1,000, bearing 6 per cent interest. Mrs. Dickinson later placed this note in the hands of her attorney for collection and it was there at the time the matter was called to the attention of the county attorney, and these charges preferred. The night before the case was called for trial, defendants paid to her attorney the sum of $500 cash in full settlement of the note, and had her endorse thereon, "Paid in full. 2-3-42. Nancy Dickinson."

Both defendants testified and denied much of the testimony of Mrs. Dickinson, but also admitted a great part of the same. It was their contention that Mrs. Dickinson had loaned them the money in question for the purpose of investing the same in the oil business. That they had invested it in the drilling of an oil well in Shackelford county, Texas, and that it had been lost. Both admitted that no lease was ever bought in Rogers county, Okla. They contended that the agreement was that the profits from the Shackelford county well were to be divided between defendant Abbott and Mrs. Dickinson, and that the note was security to repay her if she lost her money. Defendant Fletcher admitted on cross examination to having

been previously convicted of a felony. Defendant Abbott never at any time put up his part of the money for the lease, as agreed. At the request of the defendants, the jury was instructed that if they believed from the evidence that the money was a loan, that they should return a verdict of not guilty.

Under this statement of the evidence, it is contended by defendants that the evidence may be sufficient to establish the crime of obtaining money under false pretense, but under no theory of the law can it be said that the evidence constitutes the crime of grand larceny.

This contention is so fully answered by a decision of the Supreme Court of California, in a well considered opinion in a case where the facts are so identical with the facts here, that we quote therefrom. People v. Hennessey et al., 201 Cal. 568, 258 P. 49, 54:

"While the indictment in this case may well have alleged that the acts charged therein constituted obtaining money or property by false pretenses, we are not prepared to say that they do not constitute grand larceny. Unquestionably, the evidence is sufficient, and we must assume the jury found that the defendants entered into an agreement to obtain the possession of money and property by resorting to fraudulent methods which bear the appearance of trick or device. There can be but little doubt that the investors parted with the possession of their money influenced by the representations that it would be used by the defendants in promoting the enterprise to a conclusion in good faith. The money unlawfully obtained could not have been used for the purpose for which it was supposedly acquired, and as the investors believed it would be used for the reason that there was nothing upon which it could have been expended. There being no contract in existence, a fact well known to the defendants, the moneys that came into their possession were not expended in carrying forward the enterprise which the investors intended

it should aid. We are satisfied that the jury was warranted in finding a preconceived design on the part of the defendants to appropriate said moneys to their own use in furtherance of a plan and system at the time they obtained possession thereof, accomplished by means of trick and device, and therefore their acts may be classed with that species of crimes denominated larceny. People v. Delbos, 146 Cal. 734, 81 P. 131; People v. Shwartz, 43 Cal. App. 696, 185 P. 686; People v. Edwards, 72 Cal. App. 102, 236 P. 944; 17 R. C. L. 13 and 14.

"Where a false representation is made under a general plan and purpose to obtain property, it is not necessary to show that a distinct representation was made in each following act if it appears or can fairly be inferred that the first false representation was still operating upon and influencing the mind of the person imposed upon. It is only in those cases where it may be fairly presumed that the first false representation has ceased to operate upon the mind of the person thus imposed upon, or where there is some evidence tending to show that the first false representation had been removed, that full proof of the representation must again be made. In the instant case there is no doubt that under each count the possession of the money furnished by the person alleged to have been defrauded was obtained by the representation of the defendants, made either directly by them or as a direct result of the false representations which they designedly caused to be put into circulation, as to the existence of the commission contract. Other false representations shown by the evidence were made as an aid to the accomplishment of the main purpose.

"That other offenses similar to the one charged in the indictment are provable against a defendant to show scienter in cases where the criminal intent is the gravamen of the charge, as in cases of fraud, is too firmly established by the decisions of this state to require a citation of cases. In the instant case we must assume that the possession of money was obtained with a criminal intent by means of trick and device. The owners of the property surrendered

possession of their money with the understanding that it was to be used in the accomplishment of a definite object by the defendants. It was not so used. In such cases the title does not pass. The implied finding as to the intent of the defendants cannot be disturbed by this court."

In the instant case the verdict of the jury justifies the finding that the defendants entered into a plan, scheme and conspiracy to secure the funds of this widow for the purpose and with the intent to appropriate them to their own use and benefit. They preyed upon her ignorance of business affairs, and not only held out hope of her being rewarded financially, but that they were interested in the recovery of her crippled children. Not a cent of the money which they received was ever put into an oil lease in Rogers county, Okla., nor did the defendant Abbott ever put up any money as promised. The $15,000 check was never turned over to the defendant Abbott or Mrs. Dickinson. As stated in the California case above cited, she parted with her funds upon the express promise and belief that it was to be used in connection with funds of the defendant Abbott to be used in buying a Rogers county lease, and that the proceeds of the $15,000 check which the defendant Fletcher had exhibited to her would be turned over to her and the defendant Abbott. The money was not used for the purpose for which it was acquired and for this reason the title to the same had not and did not pass from her to the defendants, and defendants with the intention at all times of appropriating the same to their own use, were guilty of grand larceny by fraud, and not of obtaining money under false pretense.

In the case of People v. Miller, 169 N. Y. 339, 62 N. E. 418, 421, 88 Am. St. Rep. 546, a case where the facts are very similar, the court said:

"There can be no doubt that the complainant delivered the money to the defendant for the purpose of specula-

tion, with the understanding that the deposit should be returned with the accumulated profits; and had the defendant actually used the money in speculation, however improvident or reckless, and lost, his act would not amount to larceny. But it is plain that he never intended to use the money in speculation. The sole purpose of the pretense and device referred to was to enable him to get possession of the money of others, and to appropriate it to his own use. The jury could have so found, and their verdict imports such a finding. The jury were authorized to find, and by their verdict have found, that the complainant did not intend to part with the title or the possession of the money, but merely to give the defendant the custody of it for the purposes specified. . . .

"Larceny, as defined by section 528 of the Penal Code, embraces every act which was larceny at common law, besides other offenses which were formerly indictable as false pretenses or embezzlement. The offense of larceny at common law is established by proof on the part of the prosecution showing that the defendant obtained possession of the property by some trick, fraudulent device, or artifice, animo furandi, with the intention at the time of subsequently appropriating it to his own use. This proposition is well sustained by authority in this and other courts both before and since the enactment of the Penal Code. . . . We think that the jury could find upon the proofs in this case, and must be deemed to have found by their verdict, that the defendant received the money in question by means of trick, device, or artifice, with the intention at the time of appropriating it to his own use. The manner in which the defendant obtained possession of the money was none the less a fraudulent device, trick, or artifice because his operations were conducted upon a large scale, and assumed some of the forms of business. It was plainly intended from the beginning and at every stage of the defendant's operations to get possession of the money of others by means of fraudulent devices, and then appropriate it to his own use. This was larceny at common law, and is still larceny under the Penal Code. . . .

"The distinction between larceny, false pretenses, and embezzlement was concisely stated in the brief opinion of the court in Com. v. Barry, supra: 'If a person honestly receives the possession of the goods, chattels, or money of another upon any trust, express or implied, and, after receiving them, fraudulently converts them to his own use, he may be guilty of the crime of embezzlement, but cannot be of that of larceny, except as embezzlement is by statute made larceny. If the possession of such property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offense is that of obtaining property by false pretenses, provided the means by which they are acquired are such as in law are false pretenses. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession, merely, and not with his title to the property, the offense is larceny.' In this case the complainant's money was not obtained by the defendant by such means or representations as in the criminal law constitute false pretenses. But the jury could have found that he did obtain the money by means of a fraudulent device, with the intent on his part at the time he received it to convert it to his own use, and also that the complainant intended to part with her possession, merely, and not with the title; and so the verdict convicting the defendant of larceny was warranted by the evidence.

" . . . The evidence in the case really permitted but one inference as to the defendant's purpose, and that was that he intended to appropriate the money at the time he received it, and whatever intention is imputable to him must necessarily have existed at the time that the money was delivered to him. The jury could not have found upon the evidence that he then received it innocently or rightfully, and that during the seven or eight days that followed, preceding the collapse, formed for the first time the intention of converting it to his own use. There was nothing in the proof to authorize the jury to find that the

intent to steal was formed subsequent to the receipt of the money  Manifestly, he entertained that purpose at the time that the money was delivered to him, or he never entertained it.  Moreover, the exceptions referred to, we think, come fairly within the scope of section 542 of the Code of Criminal Procedure, which requires the court to give judgment without regard to technical errors or defects, or exceptions which do not affect the substantial rights of the parties."

And in Towns v. State, 167 Ind. 315, 78 N. E. 1012, 1013, 119 Am. St. Rep. 501, it is said:

"The reason of the rule is thus stated: 'Where the defendant, with a preconcerted design to steal the property, obtains possession of it by fraud, the taking of it is larceny, for the reason that, as the fraud vitiated the transaction and left the title in the original owner, he still retains a constructive possession of the goods, and a conversion of them by the defendant is such a trespass to that possession as makes larceny.' "

See, also, 32 Am. Jur. 920, section 31.

We have examined the cases cited by defendants: Harris v. State, 15 Okla. Cr. 369, 177 P. 122; Michelin v. State, 66 Okla. Cr. 241, 90 P. 2d 1081; Roberts v. State, 66 Okla. Cr. 371, 89 P. 2d 979, 92 P. 2d 612; Brown v. State, 18 Okla. Cr. 509, 196 P. 967; Dobson v. State, 74 Okla. Cr. 341, 126 P. 2d 95; State v. Detloff, 201 Iowa, 159, 205 N. W. 534; also later cases from this court touching upon this issue: Riley v. State, 64 Okla. Cr. 183, 78 P. 2d 712; Hagan v. State, 76 Okla. Cr. 127, 134 P. 2d 1042; Welch v. State, 78 Okla. Cr. 180, 146 P. 2d 141.

The facts in these cases are not applicable to the facts here.  In most instances, not only the possession but the title to the property had passed, and for that reason it was held that the defendant was guilty of obtaining property by false pretense, and not larceny.  Here there

was no intention of delivering the title to the check, only for a specific purpose, and the defendants at no time carried out this purpose, but at all times had in their mind the intent to use the proceeds of the $1,000 check for the purpose of appropriating the same to their own use and benefit. The check was obtained by fraud of the gravest kind. The defendants were guilty of larceny by fraud, as alleged in the information.

With reference to the second proposition, as hereinbefore quoted, it is contended that certain statements made by the county attorney in his opening statement to the jury were prejudicial to the rights of the defendants. This statement was as follows:

"Now the testimony will be that Abbott went over there and he came back after this trip with this story to Mrs. Dickinson, that this fellow was a little vague, and he was wishy-washy on that, he would talk a thousand dollars and the next day he would take five thousand dollars, and that when he took the thousand dollars over there, that the man wasn't willing to part with the lease for a thousand dollars, but he did give him the thousand dollars as a down payment, and he thought for a couple thousand dollars more, or twenty-five hundred dollars more, I am not sure, the testimony will clear that up, that he could close the deal.

"So, two or three weeks later he got another twenty-two hundred dollars check from Mrs. Dickinson. This twenty-two hundred dollar check he told Mrs. Dickinson he was going to take up and offer to this man.

"And he left and returned and reported that he had been to Claremore, and that this fellow up at Claremore was getting a little difficult, so he gave him twenty-two hundred dollars, but he needed a little more money, that he didn't quite make the deal with that, and that he explained to Mrs. Dickinson why this man needed more money—·

"Mr. Dunn: If the court please, we object to these statements for the reason that they are not part of this case. They are not entitled to be introduced in this case, absolutely foreign to it. The Court: Well, unless it is connected with the facts in this case, it will be stricken. Overruled. Mr. Gilmer: I might say to your Honor that it is our contention that this is a part of a general plan and scheme. Mr. Dunn: The difficulty about this is, your Honor, they are charged in separate actions, separate cases. The Court: Yes, that is true. The jury will be advised, unless it is that character of transaction, not to consider anything except the matter involved in this charge. Overruled at this time. Mr. Dunn: Exceptions."

It may be stated that when this evidence was offered that the court sustained an objection to the same, evidently upon the well-recognized principle of law that where a defendant is charged with one crime, evidence of the commission of other and independent crimes may not be introduced in evidence against him. But the court by this ruling failed to consider the equally well-recognized exceptions to this general rule, which made this evidence admissible in this case. In the case of Boyer v. State, 68 Okla. Cr. 220, 97 P. 2d 779, 790, this court stated:

"As a general rule, evidence of other offenses, though of the same nature, is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged. To this rule, however, there are well-settled exceptions. Those applicable to the question presented * * * in this case, are as follows:

" '(a) Evidence of other offenses similar to that charged is relevant and admissible, when it tends to prove some element of the one charged, as when it shows or tends to show guilty knowledge or intent in the commission of the offense charged.

" '(b) Evidence that tends directly to prove the defendant's guilt is not rendered inadmissible because it

proves or tends to prove him guilty of another and distinct offense.

" '(c) Evidence of a different offense from the one charged is admissible when both offenses are so closely linked or connected as to form a part of the res gestæ.

" '(d) Evidence of other offenses is competent to prove the specific offense charged when it tends to establish a systematic scheme or plan embracing the commission of two or more offenses so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the offense charged.' "

See, also, the following cases: Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann. Cas. 1916A, 689; State v. Rule, 11 Okla. Cr. 237, 144 P. 807; Reniff v. State, 53 Okla. Cr. 448, 13 P. 2d 592; Herren v. State, 75 Okla. Cr. 251, 130 P. 2d 325; Nemecek v. State, 72 Okla. Cr. 195, 114 P. 2d 492, 135 A. L. R. 1149; Chappell v. State, 74 Okla. Cr. 213, 124 P. 2d 742.

These cases held that where the evidence is a part of a scheme and plan, and so connected with the crime with which defendant is charged, and between the same parties, and especially where it was committed in connection with the same crime of which the defendant stands charged, that the evidence is admissible. The court did not permit this evidence to be submitted, but sustained an objection to the same.

Under these circumstances, it can not be said that the defendants were prejudiced by reason of the statement of the county attorney in his opening statement.

The third contention is that the closing argument of the county attorney was such as to prejudice the jury, and an expression of his personal opinion of the guilt of the defendants. This argument is given in full in the case-made. We have carefully read and reread the same. There

are some expressions therein which are not deductions from the evidence, but strong appeals for the conviction of the defendants. In some of the instances, we are constrained to believe that the court should have instructed the jury not to consider the argument, instead of saying that they were the triers of the facts from the testimony. But in view of the record in this case, we do not think that the jury was unduly prejudiced in their verdict by reason of the closing argument of the county attorney. The facts in this case justified the jury in rendering the verdict they did. We have carefully read the cases cited by defendants, where this court has reversed cases by reason of the closing argument of a county attorney. Also a number of cases where the argument has been sustained. The decisions on these questions are generally based upon the facts of the individual cases. We do not find in this case that the defendants have been prejudiced, but that they have had a fair and impartial trial, and that the judgment and sentence of the district court of Tulsa county should be affirmed.

It is so ordered.

JONES, P. J., concurs. DOYLE, J., not participating.