# WARREN v. STATE.

No. A-11270.   Dec. 27, 1950.

(226 P. 2d 320.)

John L. Ward, Jr., Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J.  The plaintiff in error, Tommy Warren, defendant in the trial court, was charged by information in the district court of Tulsa county, Oklahoma, with the crime of larceny by fraud of a certain cashier's check in the sum of $6,600 from Lee R. Eller on the 4th day of February, 1949.  Warren was tried by a jury, convicted, and his punishment fixed by the jury at imprisonment in the penitentiary for a period of three years, and judgment and sentence entered by the trial court accordingly, from which judgment and sentence this appeal has been perfected.

The first contention presented by the defendant's proof is that the trial court erred in overruling the defendant's demurrer to the evidence and in denying his request for a directed verdict.  This contention is an attack on the sufficiency of the evidence to sustain the charge as laid in the information and the judgment based on said conviction.  The defendant argues that the evidence does not support the charge of larceny by fraud, hence the necessity arises for a review of the evidence, to determine whether in the light of the charge the facts sustained the conviction of larceny by fraud.  There is no conflict in the evidence, the defendant offered none, in refutation of the charge.  Evidence in his behalf was solely limited to character witnesses.

It appears from the record that Lee R. Eller, complainant, was engaged in operating a used car lot at 1305 East Admiral in Tulsa, Oklahoma, at the time herein alleged and proved. Eller's place of business was known as the Admiral Motor Sales. Mr. Eller first met the defendant, Tommy Warren, on February 2, 1949, at Eller's place of business. Warren told Eller he was a deputy sheriff, which was in fact one of the few true statements that Warren made to Eller. Warren told Eller that he had been recommended by Mr. Lepley, sales manager of the Fred Jones Motor Company of Tulsa, and by complainant's brother, who worked for Jones. He told Eller that he had a connection in Detroit through which he could buy four Cadillac automobiles per month and could obtain delivery of two 1949 Cadillac sedanettes, 61 series, right away. Warren told Eller the cars would cost him (Warren) $3,200 each in Detroit, plus a fee of $100 for the person who was handling the deal for him in Detroit. Thus it would take $6,600 to handle the deal which Warren said he did not have. Warren said he would have to have this amount of money to take to his friend in Detroit, in order to close the deal. He also stated, he had the two automobiles sold to a man in Stillwater. Hence no cars were to be delivered to Eller on this transaction. Warren further told Eller that if he would provide the money to close the deal in Detroit, he would pay him $200 per car profit. It is well to remember this fact for it is the turning point of the case. So far as Eller was concerned, this was a loan to Warren for the purpose of engaging in what Eller thought would be a profitable enterprise. Eller said he would have to think over the deal, which he did, and after some investigation of Warren, he determined in his own mind to go on with the deal. The record dis-

closes that Eller was ill at home in bed on the 3rd of February and that the defendant called him repeatedly. During this time he checked up on Warren through Mr. Lepley and decided Warren was trustworthy. Eller next saw the defendant on February 4, 1949, when he closed the deal. The evidence further shows that Eller procured the $6,600 cashier's check from the Peoples State Bank at Tulsa made payable to "Tommie Warren", which check he was to deliver to his friend in Detroit. When Warren received the check he stated he could not use that because his given name was incorrectly spelled, that he spelled his name "Tommy". He took pains to explain that when he took the check back to Detroit it would not correspond with his identification, hence he said he would take it to the bank and get it changed. Eller said he took from Warren merely as a record of the transaction a bill of sale executed in blank by Warren. For the same purpose Warren also executed a note and mortgage, in blank, containing no specific information, with the understanding that he would later call the serial and motor numbers back to Mr. Eller, so that he could then insert the said numbers in the mortgage and deliver them to the Bankers Investment Company, from whom Eller had borrowed the money with which to purchase the cashier's check from the Peoples State Bank in Tulsa. All of said instruments appear in the record in blank with Warren's signature affixed thereto. Warren also executed his check in the sum of $6,600 dated February 4, 1949, as further evidence of the transaction. In a later transaction hereinafter referred to, involving $7,200, a worthless check in that sum was taken as evidence thereof. It appears the defendant did not take the check for $6,600 to Detroit, as he represented he would do, but instead cashed the same at the First National Bank & Trust

Company in Tulsa on February 5, 1949, the following day. The record shows the check for $6,600 was paid by the Peoples State Bank of Tulsa on February 7, 1949, which day fell on Monday. A week elapsed from the last meeting between defendant, Warren, and Mr. Eller, when Warren called Eller on the phone and told him he was back but tired. He said he was having trouble with ulcers. He informed Eller that everything was under control and that the cars would be delivered "like I told you". The evidence was the defendant had no connections in Detroit, neither that he had contacted or that had contacted him, in regard to the purported automobiles, nor had he been in Detroit nor had he ever left Tulsa. The whole transaction was steeped in iniquity and tainted by fraud from its inception. On the following Friday, February 11, 1949, the defendant called Mr. Eller and told him the cars were ready to go, that they were in an auto hotel in Detroit. Warren stated he was going up to Detroit the next day to get the automobiles. All this was likewise false. It was the setup for further fraud. He told Eller that he had obtained the price on the 62 Cadillac sedanettes, which he said he got from his friend in Detroit. He said he could buy two of these for $3,500 each, plus $100 each for his friend in Detroit. Eller said he told Warren he wanted one for his wife. This is the distinction in the $6,600 transaction and this deal. Here we have a reservation of title at least to the value of one of the automobiles, otherwise this transaction is the same as the first one. Warren told him he had befriended him and furnished the money on the first two cars, and he would get the Cadillac sedanettes for him, without a dime profit to himself. Warren stated he did not know if these cars were available, but he would call his friend and find out and let him know. Shortly there-

after he did call back and said his friend told him the two cars could be ready tomorrow evening. Warren said he would have to send the money to his friend at once. It was nearing the close of the day and Warren drove Eller through the traffic to the Bankers Investment Company. Warren waited outside and Eller got the second cashier's check, this time in the sum of $7,200 to cover the two Cadillac sedanettes. They then left for the Peoples State Bank, arriving four or five minutes after 2:00. They caught the door as a late customer was leaving and got in. They cashed the Bankers Investment check and purchased the $7,200 cashier's check payable to Tommy Warren. Before they parted Warren said he would get the cars on the way. As evidence of this second transaction Warren gave Eller a check in the sum of $7,200 payable to Lee Eller drawn on the Peoples State Bank of Tulsa, in which Warren then had no account. The check being the only instrument given to evidence this transaction. Later Eller got in touch with Warren telling him he believed he would call the last 2-car deal off. Warren informed him he had put the check in the mail to his Detroit friend. Eller suggested getting it out of the mail and Warren informed him that was impossible, that the check would hit Detroit that night, and that the automobiles would be in Tulsa Saturday or Monday before they could get the money back. The defendant after apprehension admitted that this check was never mailed as he stated but was cashed after banking hours in a Tulsa bank, where he stated he paid a teller $5 to get the money on the check. The record evidence of the check clearance confirmed it was cashed through the National Bank of Commerce in Tulsa and never sent to Detroit. All the foregoing promises and statements made to Eller in regard to the two Cadillac sedanettes, their

availability, Warren's friend in Detroit, his mailing the check, and the delivery of the cars, were false and fraudulently made as a part of the scheme to defraud Mr. Eller. The foregoing things occurred on February 11, 1949, upon the completion of which Mr. Eller had delivered to Mr. Warren in consummation of this nefarious scheme a total of $13,800, none of which Eller ever got back, and none of which cars were ever delivered or ever intended to be delivered. Warren was not heard from until the following Monday, when he called Mr. Eller from St. Louis, and Eller then apparently being aware of the fraud urged Warren to return and straighten out the deal. On Tuesday or Wednesday night Warren did return to Tulsa where he confronted Eller at the home of John Ward, who was Warren's attorney. Warren said he was sorry he had got the money from Eller and others similarly situated. He also said that he never purchased any automobiles and had no contacts through which to purchase the same. He admitted that others than Mr. Eller were also victims of this scheme to defraud. He stated that his total thefts and the losses of his victims would run approximately from $35,000 to $38,000. Warren further stated that he had lost this money gambling on horse races, prize fights, and basketball games. He said he did not understand why he did it but just kept getting in deeper and deeper all the time trying to recoup his losses. The foregoing constitutes a substantial statement of the evidence for determination of the issues herein. This charge against Warren was brought under the provisions of Title 21, § 1701, O.S.A. 1941, defining larceny, as follows, to wit:

"Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

The defendant's first contention is that the evidence is insufficient to support the charge of larceny by fraud. He contends first that Eller parted with the title and possession of the cashier's check for the purchase of two automobiles involved in the $6,600 transaction, and that the transaction amounted to no more than an obligation of indebtedness evidenced by the note and mortgage. In other words, that Eller was merely lending the defendant money in a transaction which Eller thought would be profitable. His second contention is that, even if the money or cashier's check was advanced by Eller because of artifice and false representations made by Warren, then Warren would be guilty of obtaining money by false pretenses but not of larceny by fraud, as no right of property was reserved in the money or cashier's check. The sole question confronting us is, Do the facts herein bring the case within the rule contended for by the defendant?

This court has repeatedly held that the question of whether a crime committed under conditions such as these in the case at bar depends upon the intention of the parties. This issue presents the sole contention of merit in this appeal. In Abbott v. State, 78 Okla. Cr. 407, 149 P. 2d 514, 515 this court pointed out the distinction between obtaining property by false pretense and larceny by fraud. Therein it was said:

"If one obtains possession of property by fraud, and the owner intends to part with the title as well as his possession, the offense is that of obtaining property by false pretense, but if the possession is fraudulently obtained with intent on the part of the party obtaining it to convert the same to his own use, and the person parting with it intends to part with his possession merely, and not with his title to the property, the offense is larceny."

See, also, Welch v. State, 78 Okla. Cr. 180, 146 P. 2d 141. In Dobson v. State, 74 Okla. Cr. 341, 126 P. 2d 95, 96, the rule of intention was more fully amplified:

"To constitute larceny by fraud the taking must be accomplished by the party charged from the owner of the property, in which the owner voluntarily parts with possession only, but retains the right of property in the subject-matter, and the design to convert the property to the permanent use of the taker, or someone else, must be active at the time of the taking.

"The owner must part with possession of the property alone, reserving the ownership therein, and the possession must be fraudulently obtained with the then intent on the part of the person taking it to convert it to his own or another's use in order to constitute the offense of larceny by fraud.

"If the owner parts with the possession and title, due to the deception and artifice of the taker, then the offense constitutes obtaining property by false pretenses, and not larceny by fraud.

"The intention of the owner not to part with title to his property when relinquishing possession is the vital point to be determined in distinguishing between larceny by fraud and obtaining property by false pretenses."

And in the body of the opinion:

"In 32 Am. Jur., Larceny, § 7, p. 893, it is stated: 'The distinction (between larceny by fraud and obtaining property by false pretenses) is a very nice one in many instances, and in some of the Old English cases the difference is more artificial than real, resting purely on technical grounds. The character and nature of the crime depend on the intention of the parties. The intention of the owner not to part with his property when relinquishing possession is, in this class of cases, the gist and essence of the offense of larceny and the vital point on which the crime hinges and is to be determined. The correct distinction in cases of this kind seems to be that

if by means of any trick, fraud, or artifice the owner of property is induced to part with the possession only, still meaning to retain the right of property, the taking by such means, where the requisite felonious intent is present at the time, will amount to larceny; whereas, if the owner parts with not only the possession of the goods but the right of property in them also, the offense of the party obtaining them will not be larceny, but the crime of obtaining goods by false pretenses. Primarily, therefore, the nature of the offense in a particular case where possession of goods or money is obtained by fraud is determinable by solution of the question whether the owner, in parting with possession, intended to part with his title also. Accordingly, one test for distinguishing between larceny and obtaining property, other than money, by false pretenses is said to be whether the offender can confer a good title on another by the sale and delivery of the property. If he can, the crime is obtaining property by false pretenses. If he cannot, the crime is larceny.' "

Herein Warren could pass title to the money or cashier's check, as he did do, by cashing the check, and then disposing of the money. Hence, there was no reservation of title in Eller whatsoever. See, also, Hagan v. State, 76 Okla. Cr. 127, 134 P. 2d 1042; Thompson v. Connecticut Fire Ins. Co., 203 Okla. 530, 223 P. 2d 757. It clearly appears under the foregoing authorities that the distinction for the purpose of classifying the crime, as to whether it is larceny by fraud or obtaining money by false pretense, is the point of passing title. The test is, if possession alone is passed and title is reserved in the victim, then the crime is larceny by fraud, but if both possession and title are voluntarily passed even though the inducement for the same may have been ever so fraudulent, the crime is that of obtaining money under false pretense. All of the cases hold that the question of intent to pass the title is a question of fact for

the jury. But the facts of the case must support the charge and the jury's findings. Applying these principles to the case at bar we find the controlling facts to be, that Warren told Eller that he had two Cadillac automobiles sold to a man in Stillwater, and that if Eller would provide the money to close the deal, Warren would pay him $200 per car profit. After investigation of Warren, and determination in his own mind of the prospects of the deal, Eller became interested and voluntarily provided the $6,600 cashier's check, the equivalent of money, payable to Tommy Warren. He obtained from Warren a known worthless check in the sum of $6,600, a note and mortgage executed in blank, as he said, as evidence of the transaction. However, they do constitute some evidence of indebtedness, though not a transaction handled pursuant to good business practices. Thus he placed beyond himself any reservation of title to the $6,-600. The title to the money was completely beyond his control. At no time can it be said that Eller intended to acquire any title to the automobiles, because from the outset he was advised that the two cars herein represented were sold to a man in Stillwater. Hence by no stretch of fact can it be said he at any time intended a reservation of title in either the cashier's check or the two automobiles. The situation as to the $6,600 transaction was nothing more than an enterprise which Eller thought would prove profitable. Under the facts herein Eller parted with both possession and title to the $6,600, which he delivered to Warren. These conclusions, it appears to us under the facts, are inescapable. Therefore, Eller placed himself squarely within the case of Dobson v. State, supra, wherein it was said:

"The prosecuting witness transferred the possession and title to the money which he delivered to defendant.

He was loaning defendant the money in order to engage in what the witness thought would be a profitable enterprise. If the money was advanced by Stamper because of artifice and false representations made by Dobson, the defendant would be guilty of obtaining money by false pretenses, but not of larceny by fraud as no right of property was reserved in the money which was advanced by Stamper."

The state relies only on Riley v. State, 64 Okla. Cr. 183, 78 P. 2d 712, to sustain the conviction. In Thompson v. Conn. Fire Ins. Co., supra, by our Supreme Court, it was pointed out that the cases because of Riley v. State, supra, are confusing as to the distinguishing point between larceny by fraud and obtaining property by false pretense. Therein inferentially it appears that fraud and misrepresentation alone is sufficient to constitute larceny by fraud even in the absence of reservation of title. We do not believe Riley v. State, supra, conflicts with the views herein expressed; if so, the same is modified to conform to this opinion.

In light of the foregoing analysis of the facts, and the authorities applicable thereto, the charge against the defendant as to the $6,600 transaction should have been one of obtaining property by false pretense, as defined in Title 21, § 1541, O.S.A. 1941, and not that of larceny by fraud, and the trial court erred in overruling the defendant's demurrer to the evidence. For this reason the cause must be reversed and remanded. Because of the overwhelming guilt of the defendant we regret it is necessary so to do, but we have no other alternative. Proof of a crime other than that charged in the information will not support a judgment on the charge. And since this is a government of laws and not of men, we must follow the rules prescribed by law. We have studied this case for days in an effort to find some logical and

legal basis upon which to sustain the conviction, but under the facts and the law, we are of the opinion that no other conclusion can be reached than the one hereinbefore set forth. It is most unfortunate that the county is put to the expense of prosecuting this man again, but we cannot legally sustain a conviction for a crime a person did not commit just because his guilt of committing another crime is apparent.

The defendant's second contention is that the verdict of the jury is excessive and was given under the influence of passion and prejudice. The predicate for this contention is that the evidence of the second transaction involving $7,200, and a similar deal with Gomer Evans involving $1,625 and general reference to other deals, all totalling $35,000 to $38,000, none of which was objected to, inflamed the jury's minds. This contention is wholly without merit since all this evidence was admissible under the case of State v. Rule, 11 Okla. Cr. 237, 144 P. 807, as follows:

"As a general rule, evidence of other offenses, though of the same nature, is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged. To this rule, however, there are well-settled exceptions. Those applicable to the question presented on the record in this case are as follows:

"(a) Evidence of other offenses similar to that charged is relevant and admissible, when it tends to prove some element of the one charged, as when it shows or tends to show guilty knowledge or intent in the commission of the offense charged.

"(b) Evidence that tends directly to prove the defendant's guilt is not rendered inadmissible because it proves or tends to prove him guilty of another and distinct offense.

"(c) Evidence of a different offense from the one charged is admissible when both offenses are so closely linked or connected as to form a part of the res gestae.

"(d) Evidence of other offenses is competent to prove the specific offense charged when it tends to establish a systematic scheme or plan embracing the commission of two or more offenses so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the offense charged."

Fitzgerald v. State, 85 Okla. Cr. 376, 188 P. 2d 396; Doser v. State, 88 Okla. Cr. 299, 203 P. 2d 451, holding that such evidence is admissible if it tends to establish a scheme or plan of operation, shows intent or motive, and where it is so closely related to the crime for which the accused is on trial as to throw light on it. The evidence of the other crimes complained of falls within the exception making evidence of this character admissible. Moreover, this evidence was limited by the court in a proper instruction, limiting its admissibility solely to the question of intent for which purpose it was clearly admissible. Furthermore, the judgment and sentence does not appear to be excessive since the penalty is less than the maximum of five years imprisonment for grand larceny, Title 21, § 1705. Hence, in light of the amount involved herein and the clear intent of the defendant to take the cashier's check and to appropriate its proceeds to his own use and benefit, we do not believe the three year sentence herein imposed is excessive. To the contrary, it occurs to us the jury was most lenient. In view of the foregoing conclusions this case is accordingly reversed and remanded, with directions that the defendant be held to await the filing of the proper charge of obtaining money under false pretense.

JONES, P. J., and POWELL, J., concur.